679 So.2d 229 (1996)
LOYAL AMERICAN LIFE INSURANCE COMPANY, INC.
v.
Sue M. MATTIACE.
1941777.
Supreme Court of Alabama.
May 24, 1996.
*230 A. Stewart O'Bannon, Jr. of O'Bannon & O'Bannon, Florence, Davis Carr and James W. Lampkin II of Pierce, Carr, Alford, Ledyard & Latta, P.C., Mobile, for Appellant.
Stephen D. Heninger of Heninger, Burge & Vargo, Birmingham, for Appellee.
*231 PER CURIAM.
The defendant, Loyal American Life Insurance Company, Inc., appeals from a judgment entered on a jury verdict in favor of the plaintiff, Sue M. Mattiace. The jury found that Loyal American had breached a life insurance contract and had acted in bad faith by failing to pay the insurance claim submitted by Sue Mattiace. We affirm.

I. Facts
In February 1990, Joseph F. Mattiace, who was then age 32, met with one of Loyal American's agents and applied for a life insurance policy with a face value of $32,200. As a part of the process, the agent asked Joseph a set of questions listed on the application form and recorded his answers. One of the questions asked was: "To the best of your knowledge and belief, has ... any person on whom insurance is applied for in this application: ... [w]ithin the past 5 years been arrested or convicted for the use of, or driving under the influence of alcohol or drugs? (if yes, give driver's license number and details.)" Joseph's answer to that question was recorded by the agent as "no."
Loyal American's agent, at that meeting with Joseph, reviewed Joseph's application and approved the policy as "standard," meaning that Joseph would pay the standard rate of premiums. The policy was issued with a $32,200 face value, and Joseph's mother, Sue Mattiace, was the beneficiary. The first yearly premium was paid to Loyal American by a loan from Joseph's credit union.
On March 2, 1990, Joseph was killed in an automobile accident. Blood and urine tests indicated that Joseph was legally intoxicated at the time of his death. Loyal American was notified of Joseph's death on March 12. Thereafter, it issued a check to Joseph's credit union for the amount of the unearned premium on the policy.
Sue Mattiace made a claim on Joseph's life insurance policy in August 1990. Loyal American responded by stating that because Joseph had died within two years of the policy's issue date, it would conduct an investigation to determine the truthfulness of his answers on the application form. As a part of the investigation, Loyal American obtained a "motor vehicle report" on Joseph, which revealed that he had been convicted of DUI on June 14, 1989, approximately eight months before he applied for the life insurance policy. Loyal American informed Sue Mattiace that it was rescinding Joseph's life insurance policy, based on his DUI conviction. It also informed her that it was denying her claim for policy benefits.
In response, Sue Mattiace's attorney contacted Loyal American's vice president of claims, George Lyles, and sought an explanation of Loyal American's underwriting practices that would justify the denial of her claim. On January 22, 1991, Lyles wrote a letter to Sue Mattiace's attorney, stating:
"Pursuant to our telephone conversation yesterday, I am enclosing a page from our underwriting manual which shows that we would have charged an extra premium of $3.00 per $1,000.00 of insurance for the first three years of the contract had we known about his previous driving record. Since we would not have issued the policy at the premium rate as applied for, it was proper that the policy be rescinded [based on Ala.Code 1975, § 27-14-7]."
(Emphasis added.) However, it is uncontested that the page enclosed with the "Lyles letter" was not a page from a Loyal American underwriting manual. Loyal American does not have its own underwriting manual. Instead, it utilizes numerous underwriting manuals prepared by various reinsurance companies and relies upon "subjective underwriting" based on its underwriters' background and knowledge.
The page enclosed with the "Lyles letter" was actually a page from the underwriting manual of a reinsurance company, one referred to in the record simply as "Cologne." However, the "Cologne" page did not support Loyal American's position that it would have charged Joseph a higher premium. The "Cologne" page actually indicated that for a person age 26 or over, such as Joseph, a DUI conviction within a year of the policy application would not have caused a rate increase but, rather, would have caused the policy to be issued at the standard rate.
*232 In May 1991, Sue Mattiace sued Loyal American, alleging breach of contract and the tort of bad faith. The complaint was later amended to add a third count alleging fraud, misrepresentation, and deceit. Loyal American moved for a summary judgment, which the trial court denied. Before trial, each party filed a motion in limine to exclude certain evidence. The trial court denied Loyal American's motion in limine, but granted Sue Mattiace's motion in limine.
The case went to trial in May 1995. After resting her case, Sue Mattiace voluntarily dismissed the fraud, misrepresentation, and deceit claims. Loyal American moved for a directed verdict, which the court denied. The jury returned a verdict in favor of Sue Mattiace, awarding her $32,200 on her breach of contract claim, plus $25,000 compensatory damages for emotional distress and $75,000 punitive damages on her bad faith claim. Loyal American then moved for a judgment notwithstanding the verdict or, in the alternative, a new trial or a remittitur. The trial court denied that motion. Loyal American appealed.

II. Issues
Although Loyal American appears to argue several issues on appeal, the issues may be summarized as follows: (1) whether the trial court erred in ruling on either party's motion in limine, (2) whether the trial court erred in denying Loyal American's motions for a directed verdict and a J.N.O.V. on the breach of contract and bad faith claims, and (3) whether recognition of the bad faith cause of action violates Loyal American's right to a trial by jury under the Alabama Constitution of 1901 or its right to equal protection of the laws guaranteed by the Alabama and United States Constitutions.

III. Motions in Limine

A. The "Cologne" Page
Loyal American argues that the trial court erred by denying its motion in limine to exclude the "Cologne" underwriting manual page from evidence. As noted previously, the "Cologne" page was mailed by Loyal American to Sue Mattiace's lawyer as an attachment to the "Lyles letter" explaining why it had rescinded Joseph's life insurance policy. Citing Nationwide Mut. Ins. Co. v. Clay, 525 So.2d 1339 (Ala.1987), cert. denied, 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 988 (1989), and other cases, Loyal American notes that under Alabama law, the issue whether an insurance company acted in bad faith in handling a claim must be judged solely by the information that was before the insurer when it denied the claim and that any information obtained after the denial is not relevant to the bad faith claim.
Loyal American contends that the "Cologne" page was not before it when it decided to rescind Joseph's policy. It says that its underwriting department uses a "Hudson" reinsurance manual to determine the effect of DUI convictions on life insurance applications and that its attachment of the "Cologne" page to the "Lyles letter" was simply a harmless mistake. Loyal American argues that the "Cologne" page should not have been admitted into evidence because, it says, the page was irrelevant and immaterial because, it says, (1) it did not rely on that page in denying the claim, (2) that page was not applicable, and (3) that page did not become an issue until after the claim had been denied.
In response, Sue Mattiace argues that the trial court did not err in admitting the "Cologne" page into evidence because, she says, (1) the "Lyles letter" to which it was attached indicates that it was used by Loyal American during the process of denying her claim, and (2) it was extremely relevant to demonstrate that "underwriting at Loyal American [becomes] firm and restrictive only after a claim [is] filed."
"A trial court has great discretion in determining the admissibility of evidence, and its rulings will not be reversed on appeal absent an abuse of discretion." Grayson v. Dungan, 628 So.2d 445, 447 (Ala.1993). We find no abuse of discretion in the trial court's denial of Loyal American's motion in limine to exclude the "Cologne" page from evidence. Although Loyal American argues that the "Cologne" page was not before it when it decided to rescind Joseph's policy and deny the claim, the letter written by its own vice *233 president of claims indicates the exact opposite, that the page was the basis for denying the claim. Accordingly, we believe that the "Cologne" page was highly relevant to the issues raised by Sue Mattiace's breach of contract and bad faith claims, and we conclude that it was a question of fact for the jury to determine whether the page was sent mistakenly, as Loyal American now contends.

B. Evidence of Intoxication at the Time of Death
Loyal American also argues that the trial court erred by granting Sue Mattiace's motion in limine to exclude the evidence it wished to admit to show that Joseph was legally intoxicated at the time of his fatal automobile accident. It contends that Joseph's intoxication was relevant to show the materiality of his misrepresentation on the life insurance policy applicationthat he had not had a DUI conviction within the preceding five years. Loyal American states that if Joseph had answered the question truthfully, then, unless there were extenuating circumstances, the use of its "Hudson" underwriting manual would have caused it to not issue the insurance policy to him at the standard rate but to make him a counteroffer of the same coverage at a higher rate or of less coverage at the same rate.
In response, Sue Mattiace argues that the trial court did not err by excluding the evidence that Joseph was intoxicated at the time of his death. She notes that the case did not involve any issue relating to Joseph's manner of death; rather, the case involved the issues whether Joseph's misrepresentation regarding the DUI conviction was material to the issuance of the insurance policy and whether Loyal American's refusal to pay the benefits of the policy was an act of bad faith. She says that three of Loyal American's own witnesses stated that the manner of Joseph's death was immaterial to the issue whether the claim should have been paid. She notes that Loyal American had rescinded another insured's policy for failing to disclose a prior DUI conviction, even though that person's cause of death was a stabbing. She argues that Loyal American would have claimed that the failure to disclose the prior DUI conviction was a material misrepresentation, even if Joseph had died of a heart attack or a stroke, and that the fact that he died in an automobile accident while legally intoxicated would simply have prejudiced the jury with irrelevant, immaterial facts.
In ruling on Sue Mattiace's motion in limine to exclude the evidence of Joseph's intoxication at the time of his death, the trial court stated:
"I've always thought it was unusual that the material misrepresentation, if there be one, can avoid the coverage even though the death or the loss is attributable to a totally unrelated cause. So, I think the converse would not be true that you could prove materiality because the death or the damage or the injury was occasioned by the condition which was misrepresented."
As noted above, we will not reverse a trial court's ruling on the admissibility of evidence unless its ruling was an abuse of discretion. Grayson, supra. We conclude that the court did not err in excluding the evidence at issue. It is clear from the record before us that whether Joseph was intoxicated at the time of his death was not relevant to the critical issue of this casewhether it was Loyal American's standard procedure not to issue a life insurance policy at a standard rate where the applicant had had a DUI conviction in the prior year.

IV. Directed Verdict Motion
We must next determine whether the trial court erred in denying Loyal American's motion for a directed verdict on Sue Mattiace's breach of contract and bad faith claims. In Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988), this Court stated:
"The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court's ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any *234 evidence most favorably to the non-movant."
(Citations omitted.)

A. Breach of Contract
Viewing the evidence in a light most favorable to Sue Mattiace, the nonmovant as to Loyal American's motions for a directed verdict and a J.N.O.V., we must determine whether Sue Mattiace presented sufficient evidence in support of her breach of contract claim to produce a conflict warranting jury determination. It is uncontested that a contract of life insurance existed between Loyal American and Joseph Mattiace. Sue Mattiace argues that the insurance contract was breached by Loyal American's failure to pay her the policy benefits upon Joseph's death. Loyal American argues that it did not breach the contract, because, it says, it was acting within its legal rights in rescinding the contract and denying her claim for benefits based on Joseph's misrepresentation that he had not had a DUI conviction in the preceding five years.
Loyal American notes that the concept of good faith and fair dealing implied in every contract runs to both parties of an insurance contract, both the insurer and the insured. It argues that Joseph acted in bad faith by failing to disclose his DUI conviction when he applied for the insurance.
The legislature has recognized the nature of the relationship between an insurer and an insured by enacting Ala.Code 1975, § 27-14-7. That section states:
"(a) All statements and descriptions in any application for an insurance policy ... shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:

". . . .
"(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
"(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for...."
(Emphasis added.)
Given the effect of § 27-14-7, we must determine whether there was at least a question of fact warranting a jury determination on whether Loyal American acted within its legal rights when it rescinded Joseph's insurance policy and refused to pay Sue Mattiace's claim for policy benefits. In other words, was Loyal American entitled to rescind Joseph's policy, as a matter of law?
We believe not. Sue Mattiace presented substantial evidence, which is discussed in detail below, that Loyal American's underwriting department does not have its own underwriting manual and does not follow a set of standards that are binding on its underwriters, but instead follows a practice of subjective underwriting whereby each individual underwriter makes decisions based on personal experience. These facts warrant a jury's determination whether Loyal American breached its insurance contract. Accordingly, the trial court properly denied Loyal American's motions for a directed verdict and a J.N.O.V. as to Sue Mattiace's breach of contract claim.[1]

B. Bad Faith
The elements of an action against an insurance company for bad faith refusal to pay a claim are:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal...;
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is *235 relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."
National Security Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982). See Miller v. Preferred Risk Mut. Ins. Co., 572 So.2d 1260 (Ala.1990) (citing Chavers v. National Security Fire & Cas. Co., 405 So.2d 1 (Ala.1981), and see Metmor Financial, Inc. v. Commonwealth Land Title Ins. Co., 645 So.2d 295 (Ala.1993). In bad faith cases involving an insurer's refusal to pay a claim on a policy, this Court has established the "directed verdict on the contract claim" standard.[2] In National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982), this Court stated:
"In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."
(Emphasis added.) Following the rule of Dutton, in order to decide whether the trial court erred in denying a directed verdict in favor of Loyal American on the bad faith claim, we must determine whether Sue Mattiace met her burden of proving that she was entitled to a directed verdict on the contract claim.
Thus, a critical issue is whether Loyal American was legally entitled to rescind Joseph's policy based on his failure to inform Loyal American of his DUI conviction. If Loyal American's actions were justified under § 27-14-7, then Sue Mattiace did not meet the "directed verdict on the contract claim" standard and her bad faith claim must also fail.

1.
Loyal American argues that Sue Mattiace failed to prove that she was entitled to a directed verdict on her contract claim and, thus, was not entitled to have her bad faith claim submitted to the jury. First, Loyal American contends that it proved at trial that it "followed a standard procedure of rating a policy if the insured had a DUI conviction within twelve months of the application unless there were extenuating circumstances" and that "a DUI conviction was material to the risk underwritten"; these facts, it argues, allowed it to rescind Joseph's policy under § 27-14-7. Loyal American also argues that the materiality of Joseph's misrepresentation was at least a question of fact for the jury and that the existence of a fact question precluded a directed verdict for Sue Mattiace on her breach of contract claim and, therefore, necessitated a directed verdict in its favor on the bad faith claim. Finally, Loyal American argues that because the question whether an insurer acted in bad faith by denying a claim must be judged by what was before the insurer at the time the denial was made, it says the "Lyles letter" and attached "Cologne" page, which was written two months after the claim had been denied, have no bearing on whether it acted in bad faith. In sum, Loyal American states that it had the right under § 27-14-7 to rescind the policy and thus had a legitimate reason for denying Sue Mattiace's claim for policy benefits.
In response, Sue Mattiace argues that she was entitled to a directed verdict on her breach of contract claim and, thus, that the trial court properly denied Loyal American's motion for a directed verdict on her bad faith claim. She contends that Loyal American *236 did not have a legitimate reason for refusing to pay her claim for policy benefits because, she says, had it known of Joseph's DUI conviction when he applied for life insurance, it would not have rejected the application and would not even have rated the policy premiums differently. She argues that Loyal American's use of numerous underwriting manuals, where no particular manual was binding on a particular type of risk, created an atmosphere of underwriting that makes it impossible to determine whether a misrepresentation such as Joseph's, regarding a DUI conviction, was always considered to be a material misrepresentation. Sue Mattiace emphasizes that the "Cologne" page, which was sent to her attorney as being the underwriting standard that Loyal American used to rescind Joseph's policy and refuse her claim for benefits, does not support Loyal American's current position. Rather, she says, it supports her position that if Loyal American had known of Joseph's DUI conviction at the time of his application, it would not have considered the conviction material to its underwriting risk and would have issued Joseph a policy at the standard premium. Thus, she argues, Loyal American's action did not fall within the protections of § 27-14-7, and, thus, that it breached the contract as a matter of law; thus, she argues, she met the "directed verdict on the contract claim" standard for her bad faith claim.

2.
The critical issue is whether Loyal American would have issued Joseph a life insurance policy at the standard premium if he had indicated on his application that he had been convicted of DUI within the preceding year. In other words, did it have a fixed procedure or binding rule whereby such a conviction within the preceding year always caused the policy premium to be increased? If it did have such a standard operating procedure, then Loyal American's rescission of Joseph's policy and its denial of the claim for benefits fall within the protection of § 27-14-7. Given the evidence of the loose and inconsistent manner in which Loyal American has operated its underwriting department, we conclude that it had no such standard procedure.[3]
Regarding Loyal American's motion for a directed verdict on the bad faith claim, the trial court commented:
"I find the state of evidence and the testimony from company representatives to be *237 at best confusing and at worst misleading. I was just looking here at the affidavit of Ms. Dollarhide [a Loyal American underwriter] in support of [the] motion for summary judgment where there is the unequivocal statement that `Loyal American does not have an underwriting manual on which it relies in the underwriting process. There are available from insurers a number of guides which are used in the underwriting process. There is no particular guide or manual which is binding on underwriters at Loyal American Life Insurance Company in underwriting a particular risk.'
"And, as I understand it, one of the primary evils complained of by the plaintiff is that claims process, if there is no lodestar, there is no polestar, there is no guiding star as a point of departure, then the potential for abuse, without assuming abuse in this case, becomes unlimited. It would be as if I had the Code of Alabama, the Code of Mississippi, the U.S.Code, and the Republic of Panama Code and when I was making a ruling, I'd pull whichever of those books off the shelf that I could make fit with my predisposition and predilection.

". . . .
"And let me say this about the Loyal American guideline, and I'm a little distressed that it hasn't been cleared up more clearly in the evidence, this business about whether your name is on the book or whether it has a red cover or a black cover, a lot of people use the holy writ for guidance in their daily lives but they don't have to have the Patterson Bible or the Carr Bible or the Whitten Bible written on it to be a ready reference. Some Bibles have blue backs, some have red, and some have green. The critical question to me is whether a guideline prepared by whoever with whatever color cover and with x, y, or z on the front that were the guidelines which measured the underwriting and subsequently measured the claims process. Nobody has toThere's no particular formality with which those guidelines must be adopted, but they must be identified and utilized in [a] specific [way] so a person interested in the process either inter- or intracompany or persons who deal with the company could have reasonable notice as to the measure that was being used.
"It's akin to the old carnival trick of which shell is the pea under? You know, and the rube jumps at the wrong shell and he doesn't get the Browning shotgun."
(Emphasis added.)
We agree with the trial court that Loyal American's use of numerous, differing underwriting manuals and its emphasis on each underwriter's personal subjectivity created an atmosphere in which there was great opportunity for inconsistency, where dissimilar underwriting decisions were reached regarding similar policy applicants.
This conclusion alone, however, does not answer the question whether Sue Mattiace met the "directed verdict on the contract claim" standard necessary for her bad faith claim to be submitted to the jury. Regardless of evidence to the contrary, Loyal American insists that it proved it followed a standard procedure of using the "Hudson" underwriting manual rather than the "Cologne" manual to evaluate DUI risks for life insurance. Loyal American argues that there is at least conflicting evidence on that issue sufficient to warrant a jury decision on the contract claim and, thus, that Sue Mattiace did not meet the "directed verdict on the contract claim" standard.
In response to this argument by Loyal American, the trial court stated: "I think the case [law] is also clear that a defendant can't create its own fairly debatable reason. You know that is the Catch 22 in your argument." (Emphasis added.) We believe the trial court's comment indicates that for the purpose of determining whether Sue Mattiace met the "directed verdict on the contract claim" standard, given the abundant evidence of inconsistency in the underwriting process, the court did not allow Loyal American's after-the-fact promises that it solely relied on the "Hudson" manual to evaluate "driver criticisms" to create its legitimate, debatable reason for denying the claim for policy benefits.
In Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661, 669 (Ala.1995), we *238 stated that "an insurer's subjective belief that a portion of its insurance contract precludes coverage is not an absolute defense to a bad faith claim." We also stated that if an insurer's subjective interpretation of an insurance policy could create the fairly debatable reason needed to defend a bad faith claim, then insurers would be encouraged to write ambiguous insurance policies. Id.
Similarly, if an insurer is allowed to intentionally create an atmosphere in its underwriting department where no standards are binding on its underwriters and when a claim for policy benefits is received an underwriter can pull off a shelf underwriting standards that are stricter than those that were used when the policy was issued, then the insurer would be creating its own debatable reason for denying the claim. We cannot condone such action and let self-created uncertainty as to underwriting standards defeat a claim of bad faith where that uncertainty is the very basis of the allegation of bad faith. Thus, we hold that Loyal American cannot rely upon its chosen method of "subjective underwriting" to create its own legitimate reason for denying a claim, and we conclude that Sue Mattiace presented substantial evidence in support of each element of an action for bad faith. The trial court properly denied Loyal American's motions for a directed verdict on Sue Mattiace's bad faith claim.

V. J.N.O.V. Motions
For the same reasons discussed in section IV, we hold that the trial court properly denied Loyal American's motions for J.N.O.V.

VI. Constitutionality of Allowing Bad Faith Claims
Loyal American argues that allowing the bad faith cause of action violates its right to jury trial, as that right is guaranteed by the Alabama Constitution of 1901, Art. I, § 11. Citing Smith v. Schulte, 671 So.2d 1334 (Ala.1995); Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993); Moore v. Mobile Infirmary Association, 592 So.2d 156 (Ala.1991); and Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), Loyal American states that this Court's opinions regarding the jury trial right have held that the adoption of the Alabama Constitution of 1901 "froze" the right to a trial by jury as it existed at that time. It argues that because no bad faith cause of action existed as of 1901, the recognition of such a cause of action by this Court in 1981[4] was an unconstitutional tampering with the right to trial by jury as it was "frozen" in 1901. Thus, Loyal American contends that it is unconstitutional to allow actions based on the tort of bad faith.[5]
Loyal American also contends that any action by this Court that alters the jury trial right, in violation of § 11 of the Alabama Constitution of 1901, also violates its rights under the equal protection guarantees of the Alabama and United States Constitutions. It argues that the recognition of the tort of bad faith is a violation of its equal protection rights because, it says, allowing plaintiffs a legal cause of action to recover damages for such a wrong favors plaintiffs and unfairly discriminates against the defendant insurance companies.

A. Right to Trial by Jury
Section 11 of the Alabama Constitution of 1901 states: "[T]he right of trial by jury shall remain inviolate." As noted by Loyal American, this Court has stated, albeit as dictum, that the Alabama Constitution "froze" the right to trial by jury as it existed in 1901. The Court has held: "It is well settled in Alabama that § 11 governs (1) those causes of action arising under the common law, and (2) those causes of action afforded by pre-1901 *239 statutes." Smith v. Schulte, supra, 671 So.2d at 1342 (emphasis omitted). Loyal American's argument that its right to trial by jury, as defined by § 11, is violated by this Court's recognition of the tort of bad faith, is not well taken.
There are several flaws in Loyal American's argument. First, at a basic level of legal understanding, Loyal American appears to confuse the right to a trial with the right to a trial by jury. Even if Loyal American's argument, that § 11 prevents a trial by jury for all "new" common law causes of action recognized after 1901, was correct (we hold it is not), § 11 would not make the cause of action itself unconstitutionalit would make a jury trial on that action unconstitutional. Such an interpretation of § 11 would not preclude a bench trial on the cause of action, a trial where the judge rather than a jury serves as factfinder. Thus, Loyal American's argument that allowing "new" common law causes of action (such as the tort of bad faith and those noted in footnote 5) is per se a violation of § 11 is without merit.
Moreover, it is clear that the right to a jury trial protected by § 11 applies to all common law causes of action, including the tort of bad faith. Common law causes of action are those in which legal rights are determined, as opposed to equitable rights. We have previously noted the following regarding § 11's application to common law cases:
"This rule is merely a restatement of the principle declared in Thomas v. Bibb, 44 Ala. 721, 722 (1870): `[T]he right of trial by jury is confined to cases in which it was conferred by the common law, to suits which the common law recognized amongst its old and settled proceedings and suits, in which legal rights were to be ascertained and determined, in contradistinction to those in which equitable rights alone were recognized, and equitable remedies were administered, or in which was a mixture of law and equity.' (Emphasis added) (citing Story on Const. § 1763; Tims v. State, 26 Ala. 165 (1855); Boring v. Williams, 17 Ala. 510 (1850))."
Henderson, supra, 627 So.2d at 884. See Finance, Investment & Rediscount Co. v. Wells, 409 So.2d 1341 (Ala.1981). In Henderson, this Court specifically addressed the right to a trial by jury in a bad faith case:
"Judicially created causes of action, such as the Alabama Extended Manufacturer's Liability Doctrine, bad faith failure to pay an insurance claim, or willful violations of § 339 [of Restatement (Second) of Torts] are part of the warp and woof of the common law and are, therefore, inherently within `those classes of cases in which the right [to a trial by jury as guaranteed by § 11] existed at common law.' Gilbreath [v. Wallace], 292 Ala. 267, 270, 292 So.2d 651, 653 [(1974)] (emphasis added [in Henderson])."
627 So.2d at 884-85.
Accordingly, we hold that Loyal American's right to a trial by jury, as defined by § 11 of the Alabama Constitution of 1901, was not violated by this Court's recognition of the tort of bad faith.

B. Equal Protection
As noted above, Loyal American argues that allowing the tort of bad faith violates its equal protection guarantees under the Alabama Constitution of 1901 and under the Fourteenth Amendment to the United States Constitution. Loyal American refers this Court to a series of cases holding that a plaintiff has no right to punitive damages; however, it cites no legal authority in support of its contention of unfair discrimination. "`Where an appellant fails to cite any authority, we may affirm, for it is neither our duty nor [our] function to perform all the legal research for an appellant.'" Henderson v. Alabama A & M University, 483 So.2d 392 (Ala.1986) (quoting Gibson v. Nix, 460 So.2d 1346, 1347 (Ala.Civ.App.1984). See Ala. R.App.P. 28(a). Moreover, we find no merit in the argument.

VII. Conclusion
The judgment of the trial court is affirmed.
AFFIRMED.
SHORES, KENNEDY, COOK, and BUTTS, JJ., concur.
*240 HOUSTON, J., concurs in part and concurs in the result in part.
ALMON J., concurs in the result.
HOOPER, C.J., and MADDOX, J., dissent.
HOUSTON, Justice (concurring in part and concurring in the result in part).
I concur except as to that portion of the opinion discussing the "Constitutionality of Allowing Bad Faith Claims" issue, and I concur in the result as to that issue.
HOOPER, Chief Justice (dissenting).
In February 1990, Joseph F. Mattiace, who was then age 32, met with agents of Loyal American Life Insurance Company and applied for a life insurance policy with a face value of $32,200. As a part of the application process, one of the agents asked Joseph a set of questions listed on the application form and recorded his answers. One of the questions asked whether he had been arrested or convicted for DUI in the past five years, and Joseph said "no."
On March 2, 1990, Joseph was killed in an automobile accident. Blood and urine tests indicated that Joseph was legally intoxicated at the time of his death. Sue Mattiace, the mother of Joseph and the beneficiary under the policy, made a claim on Joseph's life insurance policy in August 1990. Loyal American responded by stating that because Joseph had died within two years of the policy's issue date, it would conduct an investigation to determine the truthfulness of his answers on the application. Loyal American discovered that Joseph had been convicted of DUI on June 14, 1989, approximately eight months before he applied for the insurance policy. Loyal American informed Sue Mattiace that it was rescinding Joseph's life insurance policy, based on his DUI conviction.
Section 27-14-7, Ala.Code 1975, allows an insurer to deny benefits if an insured has made misrepresentations that are material to the insurer's acceptance of the risk. Whether an applicant for life insurance has been convicted of DUI is certainly material to the risk accepted by the insurer. DUI convictions indicate a risk of premature death, which means a higher risk; for the higher risk, Loyal American would have charged a higher premium.
Loyal American had a standard procedure for "rating" a policy when the application disclosed a DUI conviction within 12 months of the date of the application and there were no extenuating circumstances. All of the underwriters testified that this was the standard procedure. The procedure was based upon the "driving criticisms" contained in the Hudson manual used by Ms. Dollarhide and Ms. Wilkerson, the Loyal American agents who sold the insurance policy to Joseph. If Joseph had disclosed his conviction for DUI, then Loyal American, in compliance with its standard procedure, regardless of whether there were written instructions, would have issued the policy only for a lesser amount or only at a higher premium. Because of the material misrepresentation, Loyal American was entitled to rescind the policy, and it had at least a debatable reason for denying the claim.
The majority opinion says that Loyal American had no mechanism to ensure that applicants were treated uniformly during the underwriting process. This ignores the undisputed testimony of all the underwriters that, unless there were extenuating circumstances, Loyal American "rated" all policies in which the applicant disclosed a DUI conviction within 12 months of the date of the application. The policy was rated when the company considered the applicant a higher risk. A "rated" policy resulted in a higher premium. Loyal American applies different "ratings" depending on the amount of enhanced risk. If Loyal American did not have a standard policy concerning DUI convictions, why then did the standard set of questions on the application form contain a question about prior DUI convictions?
A DUI rating would have been based upon Loyal American's standard procedure and on the Hudson manual page used by Ms. Wilkerson and Ms. Dollarhide. The rating would have been consistent and uniform with Loyal American's standard procedure, provided there were no extenuating circumstances.
The plaintiff argues that Loyal American's lack of a written requirement that the Hudson *241 manual be used proves that Loyal American had no consistent procedure. However, this argument mischaracterizes the evidence and advances form over substance. Ms. Dollarhide and Ms. Wilkerson kept the Hudson manual page at their desks and relied upon it only when considering "driving criticisms." Ms. Dollarhide and Ms. Wilkerson both testified that the Hudson manual was the required guideline.
Evidence was produced concerning 27 other policyholders who had disclosed on their applications previous DUI convictions. In 14 of those instances the DUI conviction had occurred more than 12 months before the date of the application, and in those instances "standard policies" were issued, in compliance with the Hudson guideline and the policy established by the underwriters' testimony. The remaining 13 policyholders had had a DUI conviction within 12 months of the application. Loyal American issued 10 of those policies on a higher risk-rated basis. The three remaining policies had been issued "standard," based upon extenuating circumstances. The key difference between Joseph Mattiace and the other 27 policyholders is the fact that Mr. Mattiace did not disclose his previous DUI conviction, and the other 27 did. Not only did he have a prior DUI that, without an extenuating circumstance, would have required that he be issued a rated policy, but he failed to disclose that fact to Loyal American.
Under Alabama law, if an insurance carrier has a debatable reason for denying the claim, then there is no bad faith failure to pay, as a matter of law. See National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala.1982); National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala. 1982); and Burns v. Motors Insurance Corp., 530 So.2d 824 (Ala.Civ.App.1987). Because Loyal American had at least a debatable reason to deny the claim, it was entitled to a judgment as a matter of law on the bad faith claim. This Court should reverse the judgment of the trial court and remand with instructions to enter a judgment in favor of Loyal American on both the breach of contract and bad faith claims.
MADDOX, Justice (dissenting).
Today, the majority allows a beneficiary of a life insurance policy to recover punitive damages against an insurer even though there was a legitimate dispute between the beneficiary and the insurer as to whether any benefits were payable under the terms of the policy. The law does not and should not permit this to happen. Therefore, I dissent.
From the date the tort of bad faith failure to pay an insurance claim was created 15 years ago in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1, 7 (Ala. 1981), until now, when the tort no longer resembles the tort originally created, I have been concerned that insurers could be assessed punitive damages for conduct that traditionally amount to a simple breach of contract. The result reached by the majority in this case is inconsistent with the fundamental principles of due process, in that the decision permits the infliction of punitive damages in a case in which an insurer legally refused to pay a claim.
When the tort of bad faith was created in Chavers, authorizing the recovery of punitive damages, the majority of the Court at that time stated:
"[A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either `(1) no lawful basis for the refusal [to pay] coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'"
405 So.2d at 7. Several members of the Court, as it was then constituted, expressed concern about the creation of the new tort and about the direction the Court was taking. See, Chavers, 405 So.2d at 11-17. (Torbert, C.J., and Maddox, Almon, and Embry, JJ., dissenting).
The concerns of the dissenters were soon fulfilled because it was not long before the Court decided National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357 (Ala.1982), and modified the test it had established in Chavers. In Dutton, the Court adopted a policy regarding what I call the "normal" versus the "abnormal" bad faith case:

*242 "In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."
419 So.2d at 1362 (emphasis added). The Court today cites both Chavers and Dutton and purports to follow the test set out in Chavers. The majority says that "[i]n bad faith cases involving an insurer's refusal to pay a claim on a policy, this Court has established the `directed verdict on the contract claim' standard," but in a footnote to that statement of the Chavers rule, the majority states the principle it applies in this case as follows:
"This [Chavers] test is not applicable to every bad faith claim. Even if an insured is not entitled to a directed verdict on the contract claim, the bad faith claim can be submitted to the jury if the insurer recklessly or intentionally fails to properly investigate a claim or subject the results of the investigation to a cognitive evaluation and review. Further, the trial court need not expressly direct a verdict in favor of the plaintiff on a breach of contract claim in order to submit a bad faith claim to the jury. The trial court must simply determine that the plaintiff has met the standard of proof required for a directed verdict."
679 So.2d at 235 (n. 2) (citations omitted). The majority then goes further and says: "Thus, a critical issue is whether Loyal American was legally entitled to rescind Joseph's policy based on his failure to inform Loyal American of his DUI conviction." 679 So.2d at 235. If the majority, in addressing this "critical issue," was discussing the law relating to the contract claim, I would have no problem with that statement, but the majority is talking about the elements of establishing a bad faith claim. This holding punishes an insurance company for refusing to pay a claim because the policyholder had intentionally misrepresented a fact on the application for insurance.
A reading of the majority opinion, especially of a footnote in that opinion, convinces me that the majority today completely abandons the "directed verdict test" of Chavers. In Chavers, the majority of the Court unequivocally stated that the plaintiff must show that the insurance company had no legal or factual defense to payment of the insurance claim. 405 So.2d at 7. The test set out today is quite different, and when the two tests are placed side by side, it is obvious that the legal principles set out in Chavers cannot co-exist with the legal principle upon which today's case is decided, because they are directly contradictory one to the other.
Consequently, I must disagree with the majority's permitting the recovery of punitive damages in this case, in which the record shows so plainly that the insured represented to the insurance company that he had had no prior DUI convictions, and in which it is quite clear that the plaintiff, no matter what view is taken of the evidence, was not entitled to a directed verdict on the contract claim. The closer question is whether, in view of the insured's misrepresentation, the insurer itself was entitled to a directed verdict on the contract claim and had the right, as a matter of law, to rescind the policy and make a refund of the premiums, as Loyal American contended in the trial court and in this Court. See, Ala.Code 1975, § 27-14-7. Clearly, the law should not allow for the recovery of punitive damages for breach of an insurance contract when there is a dispute between the parties whether the beneficiary of the contract was entitled to any benefits under the policy, a fact not determined until the jury returned a verdict in the plaintiff's favor. Permitting such a recovery, it seems to me, raises federal constitutional questions that implicate the due process clause of the Fourteenth Amendment. In BMW of North America, Inc. v. Gore, ___ U.S. ___, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the United States Supreme Court held that a state's imposition of economic penalties on those who violate its laws, whether the penalties are legislatively authorized fines or judicially *243 imposed punitive damages, must be supported by the State's interest in protecting its own citizen-consumers and its economy. How can this judicially imposed penalty support the State public policy of punishing illegal conduct, while prohibiting an insurer from rescinding a contract where policyholder is guilty of misconduct. See, Ala.Code 1975, § 27-14-7.
Although I believe that the learned trial judge properly refused to direct a verdict on the contract claim, I believe that he erred in refusing to direct a verdict on the bad faith claim. I can understand the frustration the trial judge must have had in ascertaining whether this was a "normal" or an "abnormal" bad faith case, and I do not fault him in view of the fact that this Court keeps changing the rules regarding what constitutes conduct that warrants the imposition of punitive damages.[6] The trial judge was bound by the decisions of this Court, and although normally I would not continue to dissent when this Court has established a principle, but I will continue to dissent in most of these bad faith cases because I firmly believe that punitive damages are not appropriate in these cases, especially when the right to recover on the contract claim is disputed.
Because I believe that the majority has erred, I dissent and in this dissenting opinion I will state once again why I think the constitutional rights of Loyal American were violated by the court's allowing this jury to punish it even though there was a debatable issue presented on the question of the plaintiff's entitlement to benefits under the policy.[7]
This is not the first time, of course, that this Court has allowed for the recovery of punitive damages even though there was a debatable issue to be resolved by a jury, but it is the first time the Court has issued for publication an opinion showing the extent of the modification of the Chavers rule. In another case that involved comparable circumstances, the Court issued an opinion but later withdrew it.[8] The holding in this case, unfortunately, adds more subjectivity to the Chavers test and will be confusing to trial judges when they are faced with an insurer's motion for a directed verdict, as the trial judge in this case was.
*244 I, and other members of this Court, were concerned about the creation of the tort of bad-faith failure to pay an insurance claim 15 years ago in Chavers, and the views we expressed in Chavers should be considered in addition to those I expressed in the case of Life Insurance Co. of Georgia v. Johnson, [Ms. 1940357, April 26, 1996] ___ So.2d ___ (Ala.1996).
Most of the concerns I have about the bad faith remedy were previously expressed in a dissenting opinion that I wrote in Continental Assur. Co. v. Kountz, 461 So.2d 802 (Ala. 1984), where I said:
"These `bad faith' cases, unfortunately, in my opinion, fail to give to the bench and bar some settled principles to guide them in determining when, and under what circumstances, the tort can be established. That is the reason I consistently dissented, until I joined every member of the Court in National Security Fire and Casualty Co. v. Vintson, 454 So.2d 942 (Ala.1984), in which this Court concluded that a plaintiff had a very heavy burden in establishing a bad faith failure to pay, and that that burden was to show that the insurer, to quote from Vintson, `had no legal or factual defense to the insurance claim.' The Vintson test at least provided a more objective standard which trial judges, lawyers, and appellate judges could apply."
461 So.2d at 811. I believe the concerns I expressed in Kountz were reiterated by the United States Supreme Court in its recent opinion in BMW, where that Court stated:
"Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose."
___ U.S. at ___, 116 S.Ct. at 1591. (Emphasis added.)
It is apparent to me that today the tort of bad faith refusal to pay an insurance claim does not resemble the tort that was initially created. As the quantum and standard of proof are relaxed more and more, as in this case, the size of the awards of punitive damages concomitantly increases, creating serious constitutional due process questions.
Several years ago, then Chief Justice Torbert, in Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060, 1080 (Ala.1984), suggested that this Court should consider alternatives to the tort of bad faith refusal to pay. He noted:
"By making it attractive to sue alternatively, or even exclusively, in contract, this Court could have avoided many of the problems associated with developing a new tort. As an added benefit, much of the appellate workload would be reduced in reviewing excessive jury awards of punitive damages, since punitive damages are not available in contract."
I joined him in that view, which the Court has refused to accept.
In Kountz, I suggested that the Legislature might wish to address the public policy concerns shown by the proliferation of cases filed by policyholders who felt that they had been wronged. Although the legislature did not accept my challenge to adopt legislation to allow the recovery of additional damages for claimants forced to go to court to enforce their rights, the legislature did address some of the problems presented by the creation of the tort of bad faith, but this Court has methodically and systematically struck down practically all of that legislation as violating a plaintiff's right to trial by jury, even though the Supreme Court of the United States, in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1990), in a footnote, made a referral to one of those statutes in its discussion of constitutional protection against excessive jury verdicts. Pacific Mutual, 499 U.S. at 20, n. 9, 111 S.Ct. at 1044 n. 9.[9]
*245 I have followed the decisions of the United States Supreme Court relating to the recovery of punitive damages, including the latest decision, BMW of North America, Inc. v. Gore, which involved a punitive damages claim based on an alleged misrepresentation by a manufacturer as to repairs made to an automobile. The cases suggest an increasing concern on the part of that Court about standardless awards of punitive damages and many of those cases are Alabama cases. Although the Supreme Court, in the BMW case, did not draw a "bright line" distinction between what amount is permissible and what amount would be so greatly disproportionate to the award of compensatory damages as to offend the Constitution, it did set forth several general principles of law, one of which was articulated in Bordenkircher v. Hayes, 434 U.S. 357, 363, 98 S.Ct. 663, 667-68, 54 L.Ed.2d 604 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort"). It seems to me that the insurer in this case had a legal right to dispute the claim; therefore, to punish the insurer for refusing to pay the claim is a due process violation.
Based on the foregoing, I believe that this Court should grant Loyal American the relief to which it is entitled under the law.
Before concluding this dissent, I write about one other portion of the majority opinion, which addresses Loyal American's argument that § 11 of Alabama's constitution was violated by the judgment in this case because, it argues, the right to trial by jury was "frozen" by the ratification of the 1901 Constitution and the bad faith cause of action was not created until 1981. I agree with the majority's conclusion that § 11 applies to "[c]ommon law causes of action" and that those actions "are those in which legal rights are determined, as opposed to equitable rights." 679 So.2d at 239. That holding is consistent with what I said in my discussion of § 11 in my dissent in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), but I must respectfully disagree with the majority's statement that in Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), the Court's statement using the word "frozen" was "dictum." In Moore v. Mobile Infirmary Association, 592 So.2d 156, 159 (Ala. 1991), this Court said:
"The right to a jury trial in the courts of this state is guaranteed by Ala. Const. art. I, § 11. Section 11 provides in toto: `That the right of trial by jury shall remain inviolate.' As we explained in Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), the `crucial words' found in that section are `"shall remain inviolate."' The clause `forbid[s] the state through the legislative, judicial, or executive departmentone or allfrom ever burdening, disturbing, qualifying, or tampering with this right to the prejudice of the people.' Id. at 271, 292 So.2d at 655. Section 11 `freezes' the right to trial by jury as that right existed in 1901, the date of the ratification of our present Constitution. Id. at 269, 292 So.2d at 652; see also J. Hoffman, Alabama's Right to Trial by Jury in Civil Cases Since the Merger of Law and Equity What Has Changed and What Has Not, 32 Ala.L.Rev. 465, 488-89 (1981).
"It is undisputed that juries were employed in Alabama in 1901 to assess `quality of life' damagesdamages for pain, suffering, and other non economic loss in actions alleging negligent personal injury. See, e.g., Ensley Ry. v. Chewning, 93 Ala. 24, 9 So. 458 (1891); South & North Alabama R.R. v. McLendon, 63 Ala. 266 (1879); Barbour County v. Horn, 48 Ala. 566 (1872)."
If I am reading that statement in Moore correctly, it is bottomed on a statement made in Gilbreath v. Wallace, that statement in Gilbreath v. Wallace cannot, as the majority contends, be classified as "dictum."[10]
*246 The majority quickly and decisively dismisses Loyal American's federal constitutional claims of a denial of equal protection of the law, on the ground that Loyal American cites no authority in support of those claims. Although I note that Loyal American does not devote a significant portion of its argument to its constitutional claims, it does make this argument in its brief:
"Plaintiff's bad faith claim violates Loyal American's right to a jury trial as guaranteed by the Alabama Constitution. This Court's tort reform cases have established that the right to jury trial clause of the Alabama Constitution, Ala. Const. art. I, § 11 (1901), prevents the legislative, executive, and judicial departments from burdening the right as it existed in 1901.
"`The clause "forbid[s] the state through the legislative, judicial, or executive departmentone or allfrom ever burdening, disturbing, qualifying, or tampering with this right to the prejudice of the people...." Section 11 "freezes" the right to trial by jury as that right existed in 1901, the date of the ratification of our present Constitution.'

Moore v. Mobile Infirmary Association, 592 So.2d 156, 159 (Ala.1991) (emphasis added). This Court's rationale is based upon the proposition that the adoption of the 1901 Constitution froze the rights as they existed at that time. See, Smith v. Schulte, 671 So.2d 1334 (Ala.1995); Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993); Moore, 592 So.2d 156; and Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974).
"This Court has relied upon this proposition to declare certain tort reform statutes unconstitutional. See, Smith v. Schulte (declaring $1,000,000 cap on jury awards in medical malpractice cases unconstitutional); Henderson, 627 So.2d 878 (declaring $250,000 cap on punitive damages unconstitutional); and Moore, 592 So.2d 156 (declaring $400,000 cap on noneconomic damages in medical malpractice cases unconstitutional). As this Court recognized in Moore, § 11's prohibition on interference with the right of jury trial is not limited to the legislative and executive departments of the State. Moore, 592 So.2d at 159. The same prohibition prevents this Court from `ever burdening, disturbing, qualifying, or tampering with this right to the prejudice of the people.' Id."
Loyal American's argument is correct. Before 1981, claimants such as this plaintiff could not recover damages for personal injury, inconvenience, annoyance, mental anguish or suffering, and/or punitive damages arising out of the failure to pay benefits under an insurance policy. In fact, this Court, not the legislature, created the tort, and did so only 15 years ago. In fact, in 1987, the legislature, after vigorous debates, adopted a series of what has commonly been referred to as "tort reform" laws, which addressed the issue of the award of punitive damages in such cases, and it was this Court that declared many of those laws to be unconstitutional as violating a plaintiff's right to trial by jury. See, Smith v. Schulte, 671 So.2d 1334 (Ala. 1995); Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993); Moore, 592 So.2d 156. However, this Court has made one exception to the rule that these legislative caps violate the Alabama Constitution.[11]
*247 Under the provisions of the Fourteenth Amendment to the Constitution of the United States, corporate citizens like Loyal American are guaranteed the right to equal protection of the laws and the right to due process of law. In the BMW case, the United States Supreme Court stated:
"The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business. Indeed, its status as an active participant in the national economy implicates the federal interest in preventing individual States from imposing undue burdens on interstate commerce."
___ U.S. at ___, 116 S.Ct. at 1604. Allowing the jury to penalize this defendant based on the alleged wrong committed in this case constitutes a denial of its basic rights, and I believe Loyal American has adequately raised its claim to that constitutional protection. Consequently, I must disagree with the majority's statement that the constitutional claims were not presented. Clearly they were.
NOTES
[1] We comment below on the issue whether Sue Mattiace presented evidence warranting a directed verdict in her favor on her breach of contract claim.
[2] This test is not applicable to every bad faith claim. Even if an insured is not entitled to a directed verdict on the contract claim, the bad faith claim can be submitted to the jury if the insurer recklessly or intentionally fails to properly investigate a claim or subject the results of the investigation to a cognitive evaluation and review. Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661 (Ala.1995); Thomas v. Principal Financial Group, 566 So.2d 735 (Ala. 1990). Further, the trial court need not expressly direct a verdict in favor of the plaintiff on a breach of contract claim in order to submit a bad faith claim to the jury. The trial court must simply determine that the plaintiff has met the standard of proof required for a directed verdict.
[3] The following is a sampling of testimony given by Loyal American employees or former employees:

"Q. Is there a sentence in Underwriting for an underwriter at Loyal American, is there a single written sentence at Loyal American in the Underwriting Department that is required as a basic foundation for underwriting?
"A. I don't think so."
"Q. When there's an applicant for a life insurance policy with Loyal American, what assurance is there that the applicant will get looked at up front in the underwriting process with the same consistency as anyone else?
"A. There's no guarantee. It's just, you know, one underwriter could have gotten ahold of it versus another, a different market, a different product. I mean, weit's just based on our knowledge and our experience as underwriters."
"Q. When you say `continue underwriting the way we were' [you] have described the underwriting inside Loyal American to be subjective underwriting, correct?
"A. Correct.
"Q. That you, at Loyal American as an underwriter, Marilyn Wilkerson, Judy Herring, nobody was ever told there was any manual or guideline, whether it was Hudson, Cologne, Transamerica, there was nothing that was required to be followed, correct?
"A. Correct."
"Q. And you state there that `Loyal American Insurance Company does not have an underwriting manual on which it relies in the underwriting process. There are available from insurers a number of guides which are used in the underwriting process. There is no particular guide or manual which is binding on the underwriters at Loyal American in writing a particular risk.' Correct?
"A. Correct.
"Q. And that was true, wasn't it?
"A. That is true."
"Q. And you have never been told by anyone at Loyal American that there's any particular guide that you are required to use as a foundation on any particular risk?
"A. I have never been told that I had to use one particular guide. Different ones have been recommended but I was never told that I had to use this one and that's it."
[4] This Court first recognized the tort of bad faith in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981).
[5] Loyal American's argument would also question the constitutionality of allowing certain other common law causes of action, such as tortious interference with business relations (first recognized in Sparks v. McCrary, 156 Ala. 382, 47 So. 332 (1908)); tortious interference with contractual relations (first recognized in Tennessee Coal, Iron & Ry. v. Kelly, 163 Ala. 348, 50 So. 1008 (1909); the Alabama Extended Manufacturer's Liability Doctrine (first recognized in Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976)); and outrageous conduct (first recognized in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980)).
[6] I have examined the trial judge's comments, and I recognize the dilemma trial judges many times face in determining whether to permit a bad-faith-refusal-to-pay claim to go to a jury. Most of them attempt to apply the Chavers test, attempting to determine whether "the plaintiff is entitled to a directed verdict on the contract claim." It is apparent from the record that the trial judge was aware of the elements of a bad faith claim, as modified by this Court, and was aware that he is bound by our decisions. However, it is also apparent that in ruling on the bad faith claim the trial judge asked questions that were appropriately addressed to the motion for a directed verdict on the contract claim, where the parties did have a debatable issue presented. In my opinion, this should not be the analysis undertaken by a judge when determining whether an insurer can be held liable for "bad faith."
[7] That the Court has modified the Chavers test is shown by its holding in this case that "the trial court need not expressly direct a verdict in favor of the plaintiff on a breach of contract claim in order to submit a bad faith claim to the jury," and that "[t]he trial court must simply determine that the plaintiff has met the standard of proof required for a directed verdict." 679 So.2d at 235 (n. 2). If I am reading that statement correctly, it says: If a plaintiff produces enough evidence so that a jury could find that the plaintiff is legally entitled to recover on the contract claim, then the plaintiff's bad faith claim should also be submitted to the jury.

The holding in this case could be summarized as follows: Even if the plaintiff fails to show that he or she is "entitled to recover on the contract claim as a matter of law," the plaintiff can maintain the bad-faith-refusal-to-pay claim if the trial judge is persuaded that the defense to nonpayment interposed by the insurance company, e.g., breach of contract or intentional misrepresentation, was raised as a defense not because the facts supported that defense but merely as an excuse for failing to promptly investigate and pay the claim.
[8] In Auto-Owners Ins. Co. v. Ogden [Ms. 1930368, February 10, 1995] (withdrawn on April 7, 1995), a majority of this Court affirmed the submission of a bad faith claim to the jury and the award of $500,000 in punitive damages for the failure to pay on a fire insurance policy, even though the insurance company had presented expert witnesses, including the chief of police and the fire marshal, who expressed the opinion that the evidence, both physical and testimonial, indicated that the fire was caused by arson and even though the insurance company showed that the plaintiffs had never properly filed a claim for payment before suing.
[9] The United States Supreme Court in Haslip cited the "tort reform" statutes that had been passed by the Alabama legislature. This footnote appeared in the portion of the opinion where the Court was addressing Pacific Mutual's contention that the punitive damages awarded violated its right to due process. The Court held that the review of punitive damages in Alabama did not violate a litigant's right to due process, noting the "cap" statute that had been passed by the legislature. However, the Court stated that "[a]s long as ... discretion is exercised within reasonable constraints, due process is satisfied. See, e.g., Schall v. Martin, 467 U.S. 253, 279, 104 S.Ct. 2403, 2417-18, 81 L.Ed.2d 207 (1984); Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 16, 99 S.Ct. 2100, 2108, 60 L.Ed.2d 668 (1979). See also, McGautha v. California, 402 U.S. 183, 207, 91 S.Ct. 1454, 1467, 28 L.Ed.2d 711 (1971)." 499 U.S. at 20, 111 S.Ct. at 1044-45. (Emphasis added.)
[10] Black's Law Dictionary defines "dicta" as:

"Opinions of a judge which do not embody the resolution or determination of the specific case before the court. Expressions in [a] court's opinion which go beyond the facts before [the] court and therefore are individual views of [the] author of [the] opinion and not binding in subsequent cases as legal precedent."
Black's Law Dictionary 454 (6th ed. 1991).
[11] The Court held, in Garner v. Covington County, 624 So.2d 1346, 1354-55 (Ala.1993), that the Legislature had the power to cap punitive damages in cases involving cities and counties, "[b]ecause cities and counties are exercising governmental functions, ... and because judgments against them must be paid out of public moneys derived from taxation, the reasonable limitation of § 11-93-2[, Ala.Code 1975,] on awards against them must be sustained." (Emphasis added.)

I concurred specially in Garner, stating that although I agreed with the majority that the legislature has the power to cap damages against governmental entities, I thought that neither § 11 nor § 13 of the Alabama Constitution limits the power of that body to limit damages in purely private cases. See, Garner, 624 So.2d at 1355-56 (Maddox, J., concurring specially). In light of the holding in Garner, it appears that the character of the defendant should be a factor a court considers when interpreting a constitutional provision.