829 So.2d 111 (2002)
NATIONAL INSURANCE ASSOCIATION
v.
Betty SOCKWELL.
1001627.
Supreme Court of Alabama.
March 15, 2002.
*113 Ralph M. Young and Sherry Collum-Butler of Gonce, Young, Sibley & Collum-Butler, Florence, for appellant.
*114 G. Rick Hall and Charles J. Kelley of Almon, McAlister, Baccus, Hall & Kelley, L.L.C., Tuscumbia, for appellee.
STUART, Justice.
National Insurance Association, a defendant in an action in Colbert Circuit Court, appeals from a judgment entered on a jury verdict in favor of the plaintiff, Betty Sockwell. We affirm.

Introduction
Sockwell sued her insurer, National Insurance Association ("National"), alleging that National acted in bad faith in failing to properly evaluate and failing to investigate and ultimately in denying her claim for underinsured-motorist ("UIM") benefits. Sockwell also alleged breach of an insurance contract, but National paid Sockwell the contract benefits before trial.[1] Sockwell's bad-faith claims were tried before a jury; the jury returned a verdict in favor of Sockwell and awarded her $201,000 in compensatory damages and $600,000 in punitive damages. The trial court denied National's posttrial motions for a judgment as a matter of law, a new trial, or a remittitur.
National appeals on three grounds. First, National contends that it was entitled to a judgment as a matter of law on the bad-faith claims because, it says, Sockwell was not entitled to benefits at the time it denied her claim, and, therefore, she had no cause of action for "bad faith" and because, it says, Sockwell failed to prove it had the necessary intent to support a bad-faith claim. Second, National contends that the damages awarded are unsupported by the evidence, or, alternatively, that the compensatory damages and the punitive damages are excessive. Finally, National contends that the tort of bad-faith failure to pay as applied to a UIM claim is "ill-conceived" and, because it is applicable only in the insurance-contract context, is unconstitutional. We reject each of these arguments, and we affirm the judgment entered by the trial court.

Facts
On March 25, 1997, Betty Sockwell suffered serious bodily injuries when the vehicle in which she was a passenger was rearended by driver Keith Etheridge Dodd. At the time of this accident, Sockwell was working within the line and scope of her employment as a licensed practical nurse ("LPN"). Sockwell notified her employer of the accident and filed a claim for workers' compensation benefits.
Sockwell's primary injury was to her spinal cord and neck. She underwent surgery in which steel rods were surgically implanted in her neck to stabilize it; she also wore a "halo" apparatus around her head for approximately eight weeks. Her medical expenses exceeded $60,000, and she was rendered totally disabled.
At the time of this accident, Sockwell was insured under two automobile insurance policies issued by National Insurance Association. Each policy carried UIM coverage in the amount of $20,000; thus, because her policies could be "stacked," Sockwell had a total of $40,000 UIM coverage available to her under her National policies. In May 1997, Sockwell's attorney notified National of Sockwell's injuries and that she had been rendered totally disabled, *115 that the coverage available to Sockwell from the responsible driver and other available insurance was inadequate, and that Sockwell would be seeking UIM benefits under her National policies.
Sockwell's UIM claim was assigned to Patrice Hawthorne, a National claims representative working out of Indiana. At the time Sockwell's claim was assigned to her, Hawthorne had approximately 24 years' experience adjusting insurance claims. Hawthorne's experience was primarily in adjusting workers' compensation claims, although she had adjusted automobile-accident claims for "about five or six years." At the time Hawthorne was assigned to handle Sockwell's claim, Hawthorne had been employed with National for approximately one year.
National maintains a computer "notepad" in which its adjusters summarize their work on each claim. The record reflects that, on October 2, 1997, Hawthorne entered the following notations in National's computer notepad:[2]
"no contact from atty representing ins since 6/6/97. mrs. sockwell was a psgr in veh that was rear ended by an apparently uninsured vehicle, closing file."
On April 17, 1998, Hawthorne made another entry in National's computer notepad:
"rec'd call from atty grant wright asking abt our policy provisions to pay ins dmgs which far exceed responsible party's ins cov of $20k. told him of $1k med pay cov but i believe our policy excludes pymts if injury payable under wc [workers' compensation] cov. he said this is wc & he has filed for wc benefits for ins but wc insurer is disputing wc applicable, he asked about um covtold him our cov is uninsured, not underinsured & if responsible party has ins our policy is not applicable, he asked for a ltr w/copy of policy. Told him @ this time i must deny claim as our policy provisions clearly exclude this situation. He will review my ltr & policy copy & if he disagrees will call to discuss, file remains closed."
On that same date, Hawthorne sent a letter to Grant Wright, Sockwell's attorney, denying Sockwell's claim for UIM benefits under the National policy. In denying the claim, Hawthorne stated:
"[W]e have no coverage for your client since our Medical Payments coverage excludes injury which occurs during the course of employment if workers' compensation benefits are required or available for the bodily injury. Our Uninsured Motorist coverage is just that, payable only if the party who causes the accident is uninsured. It is not Underinsured Motorist coverage."
On July 12, 1998, Wright notified Hawthorne that her denial of UIM benefits under National's policy was incorrect. Wright informed Hawthorne:
"As I stressed in our phone conversation, we are not asking for med pay coverage. The exclusion listed on Page 4 upon which you are relying excludes solely medical payments coverage and does not apply to uninsured or underinsured motorist coverage.
"Secondly, you are asserting that my client is not due benefits because the policy is for uninsured motorists coverage and applies only if the party who causes the accident is uninsured and does not apply in situations where the tortfeasor is underinsured. As I have stressed to you in our conversations, uninsured motorist is defined in § 32-7-23 *116 of the Alabama Code to include situations where the tortfeasor is `underinsured.' I have enclosed a copy of this statute for your review."
On July 23, Hawthorne acknowledged receipt of Wright's July 12 letter and requested copies of Sockwell's medical bills and records. On August 4, 1998, Wright forwarded copies of Sockwell's medical information.
On September 3, 1998, Wright wrote Hawthorne and notified her that the insurer for Keith Dodd (the driver of the vehicle responsible for Sockwell's injuries) had offered its policy limits; Wright requested permission to settle Sockwell's claim with Dodd's insurer and also demanded that National pay Sockwell the policy limits of her UIM benefits. On September 18, 1998, Hawthorne responded, again denying coverage for Sockwell's claim. This second denial was based upon the assertion that the National policy "excludes payment for any loss covered under any worker[s'] compensation law." The actual policy provision relied upon by Hawthorne stated, in pertinent part:
"LIMIT OF LIABILITY
". . . .
"D. We will not pay for any element of loss if a person is entitled to receive payment for the same element of loss under any of the following or similar law:
"1. Worker's Compensation Law...."
Hawthorne stated in her letter denying coverage that Wright should feel free to telephone her or to correspond with her if he had any questions or if he wished to discuss the matter further.
In March 1999, Wright, on Sockwell's behalf, sued National. In the complaint, Sockwell alleged breach of the insurance contract[3] and bad-faith failure to pay a claim or, alternatively, intentional or reckless bad-faith failure to properly investigate an insurance claim, or, alternatively, intentional or reckless bad-faith failure to subject the results of National's investigation to a cognitive evaluation and review. Sockwell's allegations were premised upon her claim that, in 1971, the Alabama Supreme Court had declared a similar workers' compensation limit-of-liability provision void under Alabama law. State Farm Mut. Auto. Ins. Co. v. Cahoon, 287 Ala. 462, 252 So.2d 619 (1971).

Events Occurring After the Filing of the Lawsuit
After the complaint was served on National, it was forwarded to Kathy West, a senior claims analyst for GRE Insurance.[4] Kathy West testified that, immediately upon reviewing the file, she knew the claim was ripe for payment; that she knew "there was no basis in law or in fact for denying the claim"; that "when [she] reviewed this claim file shortly after receipt of the lawsuit, [she] knew there was no basis in law or fact to deny the breach of contract claim"; and that when she reviewed Sockwell's claim file at that time, "there was no other information that [she] needed to have before realizing that the obligation to pay the claim was ripe." She reviewed the file and made an entry in National's computer notepad, stating:

*117 "I RECEIVED THE ABOVE SUIT AND REVIEWED. Adjuster denied the claim by stating the policy did not provide for UIM BENEFITS. This was incorrect. ALABAMA UM [uninsured motorist] LIMITS ALSO CONTAINS UIM COVERAGEIT IS BUILT IN. ALSO IN ALABAMA IT IS AGAINST PUBLIC INTEREST TO OFFSET THE UM/uim LIMITSit would stack."
(Capitalization in original.)
Kathy West testified at trial that Hawthorne should have looked at a variety of factors in order to properly adjust Sockwell's UIM claim. During West's testimony at trial, the following exchange occurred:
"Q [Sockwell's attorney]: And the way a claims department [adjusts a claim] is it gathers information and evidence on claims that the insurance company may owe coverage on. Correct?
"A [Kathy West]: That's correct.
"Q: So, for example, if you have a car-wreck claim, you have to gather information on the extent of the injuries that the person injured has suffered, don't you?
"A: Yes.
"Q: You get the medical bills, don't you?
"A: Yes.
"Q: You get the lost-wage information, don't you?
"A: Yes.
"Q: But you don't stop there, do you? You gather more information.
"A: Yes.
"Q: And that's because any rational adjuster dealing with an auto accident knows that under certain scenarios, the injured person is entitled to get more than just lost wages and their medical benefits paid. Correct?
"A: Yes.
"Q: And those circumstances include, for example, when someone is totally disabled from an accident. Right?
"A: Yes.
". . . .
"Q: And any, any experienced claims adjuster, you would expect to know, without being told or instructed, that its people in car-wreck cases can recover elements of loss more than just wages and medical payments. Correct?
"A: I do know that. Yes, sir.
". . . .
"A: I'm speaking of myself. I know that. I don't know somebody that has another 24 years' experience, I can't speak for them.
". . . .
"Q: Ma'am, ... wouldn't it be... Wouldn't it be shocking to you that a person who had 24 years of experience adjusting claims, 5 of which were dealing with automobile-wreck cases, to find out that they claim they did not know, based upon that experience, that a person in the automobile-wreck case could recover elements of loss other than just medical payments and lost wages?
". . . .
"Q: In fact, part of what a claims adjuster has to do, according to y'all's manual, for example, and it's not just y'all's manual but you've worked at other companies, everybody's manual says when you're adjusting an automobile-wreck case, you look for evidence of not just lost wages and medical bills but you look for their permanent impairment and disability. Correct?
"A: That's correct.
"Q: Because you know that's an element of loss they can recover. Correct?
"A: Yes, sir.

*118 "Q: You look for their past pain and suffering, don't you?
"A: Yes.
". . . .
"Q: You look for future pain and suffering. Correct?
"A: Yes.
"Q: You look for scars and disfigurement. Don't you?
"A: Yes.
"Q: You look for the trauma of having, for example, steel rods in your neck. That's an element of loss, isn't it?
"A: Yes.
"Q: You look for the loss of enjoyment of life because a person can't do the things physically they could do not just in the work context but in everyday living; isn't that right?
"A: Yes.
". . . .
"Q: And those are things that you would expect any adjuster dealing with automobile cases to have knowledge of if they were doing their job even halfway appropriately.
"A: Yes."
West also acknowledged that National's claims manual, which is given to each claims adjuster to use in performing his or her job, lists the elements of loss potentially suffered by a claimant involved in an automobile-accident case; it acknowledged that those elements include pain and suffering, emotional distress, disfigurement, and loss of the enjoyment of life.
West testified that she believed the denial of Sockwell's claim based upon the workers' compensation limit-of-liability provision was invalid for two reasons. First, a provision limiting an insurer's liability in such a case has been declared void under Alabama law. See State Farm Mut. Auto. Ins. Co. v. Cahoon, supra. Thus, National should not have relied upon that provision to deny Sockwell's claim. Second, West testified that, even if the provision limiting liability if workers' compensation benefits are available could have been applied by National, Sockwell's claim still was denied improperly, because Sockwell had the right to recover certain elements of loss sustained in the automobile accident that would not have been covered under Alabama workers' compensation law and, thus, would not have been excluded under the limit-of-liability provision. West acknowledged that, in order to evaluate properly whether a claim should be paid under the limit-of-liability provision as written in the National policy, Hawthorne should have determined the elements of the loss Sockwell had suffered as a result of the automobile accident and compared those to the elements of loss payable under Alabama workers' compensation law. Under the plain language of the limit-of-liability provision, any elements of loss suffered by Sockwell, other than those payable under Alabama workers' compensation law, were reimbursable. West admitted at trial that Sockwell's medical records, which National received before it denied Sockwell's UIM claim in September 1998, established that Sockwell had endured pain and suffering and had suffered emotional distress, disfigurement, and a loss of enjoyment of life as a result of the automobile accident. Thus, Sockwell's claim was entitled to consideration and, according to West, to payment of the policy limits.

Settlement Efforts and Discussions With Sockwell's Attorneys[5]
After receiving notice of the lawsuit, Kathy West telephoned Mike Tanner, who *119 was at that time one of Sockwell's attorneys. According to Tanner, Kathy West indicated "that she had the lawsuit, that she had reviewed their file. And it appeared that the claim should have been paid." Tanner testified at trial that West "inquired as to whether if she sent me the money for policy benefits, that would dispose of the case." Tanner indicated that his response to this inquiry was that he would have Grant Wright respond to her settlement offer but that he did not believe Sockwell would abandon her bad-faith claims.
Wright telephoned West and indicated that Sockwell would accept $400,000 to settle her breach-of-contract and bad-faith claims. Wright testified at trial that West became very agitated and told him that
"if we did not take the policy limits, that she would drag this case out for as long as she could, that it would be three to four years before I ever saw her to take her deposition. And if we ever did get a judgment against her company, that she would appeal it for as far and long as she could. And it would be eight or nine years before my client ever saw the money."
This testimony was presented to the jury.
Tanner corroborated this testimony. He testified at trial that Wright came into his office immediately after his conversation with West and that Wright relayed the substance of that conversation to him as follows:
"He [Wright] went on to say that he had called [West] to make a settlement offer in the case, that he made the settlement offer, and that when he did, she became very angry. I believe his words were, `She lost it,' that she then told him that if that's the way he felt about it and Miss Sockwell felt about it, that it would be three or four years before she would ever seehe would ever see her face in a deposition.
"And it would be, if he was successful in getting a verdict at trial, they would appeal it, and it would beThey would appeal it as far as they could appeal it. And it would be eight or nine years before Ms. Sockwell ever saw any money in the case. And that she was sure that Ms. Sockwell probably needed the money, and that he ought to let her know how long it was going to be before she would see any if he insisted on proceeding with the lawsuit."
The jury was allowed to hear this testimony.
Kathy West admitted at trial that she did, in fact, say to Wright that "Mrs. Sockwell could use the money now." Her explanation for this statement was that "I didn't understand why he was not accepting to settle the underlying claim. And he flat refused to accept the policy limits."
According to Wright, West offered only the $40,000 policy limits to Sockwell after the bad-faith claims were filed, and only if Sockwell would dismiss her lawsuit. West later added an additional $1,000 to the offer, but Wright testified that this offer was also contingent upon Sockwell's settling all of her claims against National.
After these settlement discussions, National answered Sockwell's complaint, denying that it had breached the insurance contract, denying that it had acted in bad faith in denying Sockwell's claim, and denying that it had acted in bad faith in failing to properly evaluate Sockwell's claim.

National's Defense to Sockwell's Bad-Faith Claims
Despite West's acknowledgment that upon reviewing the file she thought Hawthorne *120 had improperly denied Sockwell's claim and that Sockwell's claim was ripe for payment and despite West's admission that Hawthorne had not properly evaluated Sockwell's claim, National defended the bad-faith claims at trial based upon the following events:
Shortly before the trial of this matter began, National learned that, at the time it denied Sockwell's claim, Sockwell had not reached a final settlement with one of the other insurance carriers involved in this incident. National learned immediately before trial that Sockwell had not reached a final settlement with another insurance carrier until December 1998three months after the date of National's formal denial of Sockwell's UIM claim.
National did not dispute the severity of Sockwell's losses, nor did National deny that her losses exceeded the other insurance available to her and that she would, at some point in time, have a viable claim under her National UIM coverage. National's defense was one of timing: Sockwell's claim against another insurance carrier had not been finalized at the time National denied the claim, and Sockwell's coverage with National did not ripen until she had exhausted the insurance coverage available to her through all other carriers.
However, National did not make this "failure to exhaust coverage" a basis for its denials of Sockwell's UIM claim; this was not given as a reason in any of its letters to Sockwell denying coverage, and National never requested information from Sockwell regarding this "exhaustion" issue at any time during the course of adjusting her claim for UIM benefits. As of September 1998, National issued an outright denial of Sockwell's UIM claim; in doing so, it relied solely upon the workers' compensation limit-of-liability provision in the policy. The "exhaustion-of-coverage" issue was not discussed with Sockwell's attorneys until after the bad-faith action had been filed in 1999.
Additionally, National did not plead this failure-to-exhaust-coverage defense as an affirmative defense to Sockwell's complaint, and Sockwell's attorneys filed a motion in limine to limit any reference to this issue at trial. National's attorney responded that it was not required to plead failure to exhaust coverage as an affirmative defense because, it argued, as part of Sockwell's prima facie case, she had the burden of establishing that the other coverages available to her had been exhausted. However, National attempted to amend its answer during the trial to assert this defense.
Sockwell's attorneys objected to this motion to amend the pleadings, arguing that to allow the amendment at that stage of the litigation would prejudice Sockwell and would require additional discovery to rebut the defense. Sockwell's attorneys also challenged National's interpretation of the UIM provision contained in Sockwell's policy and the proper application of that provision in this case.[6] The trial court granted *121 Sockwell's motion in limine; it denied National's motion to amend its pleadings.

Testimony of Patrice Hawthorne
National's claims adjuster, Patrice Hawthorne, testified at trial. She testified that she felt that she and Sockwell's attorneys were working "on the same team in terms of representing the same party" and that she believed Wright would let her know if he believed National had improperly denied Sockwell's claim. Hawthorne testified that she included in her denial letter of September 18, 1998, the statement "[s]hould you have any questions or wish to discuss this matter further, feel free to call or correspond with me" because she was counting on Wright to contact her if the denial letter was improper.
Hawthorne testified that she was knowledgeable about workers' compensation law in general and that she was aware that, under the workers' compensation laws of many states, an injured party could not recover for pain and suffering, emotional distress, or loss of enjoyment of life. Hawthorne stated that, in her experience, scarring and disfigurement are compensable items under the workers' compensation laws of certain states. Hawthorne testified that she had adjusted automobile-accident claims and that some of the elements of loss she would look for in such claims included past, present, and future pain and suffering, mental anguish, scars and disfigurement, loss of enjoyment of life, and out-of-pocket expenses. Hawthorne admitted that, at the time she denied Sockwell's claim, she knew from reviewing the medical records that Sockwell must have experienced all of these compensable items of loss as a result of the automobile accident.
However, Hawthorne testified that she was unfamiliar with Alabama law and that she did not know that Alabama law required insurers to provide UIM coverage, nor did she specifically know what injured employees could recover under Alabama workers' compensation law. Hawthorne testified that she had no idea that the provision in the National policy excluding UIM coverage was void under Alabama law. She also testified that she had no idea that the workers' compensation exclusion upon which she relied in denying Sockwell's claim had been declared void in Alabama. She said that she had never received any information from National's litigation department informing her that either provision was void under Alabama law, although she was one of only 9 or 10 adjusters assigned to adjust Alabama claims.
Hawthorne testified that, in denying Sockwell's claim, she did not consult with any other employees of National, with National's litigation department, or with National's claims management, despite the fact that National's company procedure requires a claims adjuster to consult with management or to obtain management approval before denying a coverage claim. Hawthorne admitted that "not infrequently" she and other National claims adjusters would deny coverage claims without obtaining supervisor approval, even though this practice violated company procedure. Hawthorne testified that she and the other claims adjusters were never reprimanded for denying coverage claims in this manner. In fact, Hawthorne testified that, until this action was filed, she was unaware that she needed to read the claims manual or that she needed to obtain management approval before denying a claim.
*122 Hawthorne testified that when she sent the September 1998 denial letter, she was relying upon Wright to let her know if her denial was in error, just as he had done regarding her earlier denial letter. She claimed her lack of independent investigation was reasonable because she and Wright were "working on the same team" on Sockwell's behalf and because Wright previously had been such a good source of information on Alabama law. However, she admitted that she knew she could not rely upon Wright to adjust the claim for her or to make decisions for her.
Hawthorne also acknowledged that while she was employed with National, she was responsible for adjusting claims in eight different states. She testified that she had never had responsibility for so many different states at once and that one of the reasons she left her employment with National was to take a job with another insurance company and, in doing so, to limit the number of states for which she was responsible.
The record reflects that, in connection with a summary-judgment motion National filed in this action, Hawthorne filed an affidavit regarding what she knew at the time of, and what she did in connection with, the September 1998 denial of Sockwell's claim.[7] Hawthorne's notepad entry of September 18, 1998, reflects that she was told, on that date, by Wright that Sockwell's workers' compensation claim was being litigated. However, Hawthorne filed an affidavit in support of National's motion for a summary judgment, attesting that on that date "Mr. Wright advised me that Mrs. Sockwell had settled her workers' compensation claim related to the accident. I feared that Mrs. Sockwell's coverage would not allow her to be paid twice for [the] same injuries. And so I once again reviewed her policy."
On the stand, however, Hawthorne admitted that the information in her affidavit was false because, at the time she denied Sockwell's claim, she knew the workers' compensation claim had not been settled but that it was in litigation. The jury heard this testimony.
In addition to hearing Hawthorne's admission that her affidavit contained false information, the jury could have construed other portions of Hawthorne's testimony as lacking credibility. Hawthorne began her testimony by stating that she viewed herself as "working on the same team" with Sockwell's attorneys and as being in a "special relationship" with Sockwell. Hawthorne testified that she did not check with anyone at National to determine the validity of the UIM exclusion or the workers' compensation provision in Sockwell's policy because "I had been working with Mr. WrightI felt that he was the more appropriate person to discuss my concerns with because he was directly involved." Despite this testimony, Hawthorne admitted that she never asked Wright whether the workers' compensation provision was valid under Alabama law, what losses Alabama workers' compensation law covered, or whether Sockwell had suffered any loss other than those losses covered by Alabama workers' compensation law.
Hawthorne also testified that, in her role as a National claims adjuster, she tried to provide coverage for the insured whenever possible and that she would place herself in the shoes of the insured when she was adjusting a claim. However, she later testified *123 that she was not "worried"[8] about whether Sockwell received any of the benefits under the policies or whether Sockwell was receiving any income. She testified that "[i]f I worried about every case that I handled, I would be in a mental institution, literally."
Finally, Hawthorne was questioned about the date shown in National's computer-notepad records as the date Sockwell's claim was actually denied. National's computer records reflect a date of "05181998" as the date the "free-form letter"[9]the denial letter of September 18, 1998was entered into the computer.[10] That same record also reflects that this free-form letter was completed on "09181998."[11] Hawthorne denied knowing why the denial letter would have been entered into the computer as early as May 18, 1998, when Hawthorne purportedly was still in the process of gathering information to adjust Sockwell's claim. Sockwell's attorney suggested that Hawthorne had decided to deny Sockwell's claim in May 1998 and that she had simply spent the next few months gathering paperwork to justify that denial. Hawthorne denied this interpretation of events.

Testimony of Vicky L. Schmitz
Vicky Schmitz, a "claims unit leader" at National, testified at trial. At the time of the trial, she had been employed at National for 14 ½ years. Schmitz formerly served as a claims representative, adjusting only automobile-accident claims. She was promoted to the litigation department and then to the position of a claims unit leader, where she is responsible for performance reviews, evaluations, monitoring files, training employees, hiring, reprimands, corrective actions, and adjusting claims, if necessary. At the time of trial, she was supervising 11 claims representatives.
Schmitz testified as to National's typical training procedures for claims representatives such as Patrice Hawthorne. Schmitz testified that National provides its claims representatives with manuals and that the claims representatives are asked to read those manuals and to familiarize themselves with the policies and procedures of the company. She agreed that company policy prohibits a claims representative from denying coverage on a claim without consulting with, or obtaining the approval of, a supervisor. Schmitz testified that the claims representatives are instructed where to find answers to legal questions and are given access to National's litigation department and to National's "panel attorneys," whose names and telephone numbers are listed in the back of the reference books provided to the claims representatives. She testified that the claims representatives are taught that, in adjusting a claim, and in particular, in interpreting whether coverage exists under an insurance policy, it is important to know how a particular state interprets the applicable policy provisions. Schmitz *124 agreed that, in order to adjust a claim properly, a claims representative should not rely on an insured's lawyer's interpretation of a particular state's law.
Schmitz also testified that, before National's September 1998 denial of Sockwell's claim, she was aware that the limit-of-liability policy provision was unenforceable under Alabama law. She testified that she most likely learned this information during her tenure with National's litigation department, which occurred before she became a claims unit leader and before Sockwell's claim was denied in September 1998. She did not specifically recall whether the litigation department passed this information on to the claims department. Schmitz stated that she did not know why National continued to include invalid provisions in its policy.

Testimony of Betty Sockwell
Sockwell testified at the trial. She testified that at the time of the accident she was working as a licensed practical nurse ("LPN") and that she was attending school to become a registered nurse. She lacked six months completing her nursing degree.
In 1992, Sockwell had surgery to remove a malignant tumor from her spinal cord; that surgery left her with some pain and muscle weakness on her left side. She underwent radiation and chemotherapy and was able to return to work as an LPN later in 1992 or 1993. She worked continuously as an LPN until this accident.
This accident in March 1997 rendered Sockwell unconscious. When she regained consciousness, she was unable to move her left arm or leg for three days. She was examined by a neurosurgeon, who informed her that her spinal cord had been injured to the point that, if she suffered even a minor injuryfor example, a "too tight hug"she faced paralysis. In order to stabilize her spinal cord and neck, she underwent a "circle stabilization" in which metal rods were implanted on either side of her spinal cord. Sockwell also wore a surgically attached metal "halo" apparatus around her head for approximately eight weeks to further stabilize her spinal cord.
Sockwell testified that, as a result of the automobile accident, she suffered a loss of rotation in her neck; she testified that she can "turn her head to the right about 40%" and can "turn her head to the left only 15%." She testified that after the accident her lingering pain from the cancer worsened and that she went from taking one prescription medicine to taking four prescription medicines daily. She was unable to return to work as an LPN.
Sockwell testified that she encountered difficulty in obtaining compensation for her lost wages in the months following the accident and that she did not receive any compensation for lost wages until seven months after the accident. She stated that after only a few months, the compensation ceased and she did not receive any further compensation for a year. Sockwell testified that, as a result, she was unable to cover certain obligations she had incurred solely in her name and she was forced to depend on her husband to pay those bills for her. She testified that her husband had to work 70-80 hours a week to compensate for the loss in income.
Sockwell testified regarding the emotional distress these events caused her:
"A: I was under a lot of stress dealing with the workers' comp. I had been told I could no longer work. I had lost a career, a career I loved, that was a part of me. And I had lost my independence because I had to turn to my husband.
"And I was dealing with that, dealing with the fact that I was having to change my life, dealing with new pain that I had not had to deal with before. And yet that presented a lot of stress.

*125 ". . . .
"Q: How did it make you feel to learn they had denied your claim a second time?
"A: First, it confused me because I couldn't understand why a company that I had put my faith and trust in, you know, to be there for me when I need them. And, you know, to turn me down a second time, hurt. It really hurt, and then I became angry. And that posed another stressful situation.
"Q: Did it make you mad?
"A: Yes.
"Q: Betty, the feelings that you had about this, the emotions that you experienced, how did they affect you physically, if at all?
"A: I couldn't sleep. I would get tired, and this would cause my problems to get worse. The pain would get worse. ThatAnd that would mean having to take extra medication to try and keep the pain in control. That would make me tired and sleepy. And I didn't feel like doing anything. So I just, basically, just, kind of, had to lay around and take medication to try and keep things under control."

Analysis and Discussion

I. Did Sockwell Prove a Prima Facie Case of Bad Faith?

National contends that it was entitled to a judgment as a matter of law on Sockwell's bad-faith claims on two separate grounds. First, National asserts that, in order to recover, Sockwell must have been entitled to benefits at the time her claim was allegedly improperly evaluated and denied. National alleges that, at the time its claims adjuster denied Sockwell's claim for UIM benefits, Sockwell was not yet entitled to any benefits under her insurance policies because she had not yet settled with another carrier. Therefore, National contends, Sockwell had no cause of action for bad faith, even if its evaluation and denial of her claim were improper.
National also contends that it was entitled to a judgment as a matter of law because, it argues, Sockwell failed to prove that it acted with a "bad-faith" intent. National asserts that although its claims adjuster acted negligently, negligence does not give rise to a claim for bad faith.

A. Standard of Review

This Court has addressed the proper standard of review to be applied in reviewing a trial court's ruling on a motion for a judgment as a matter of law:
"When reviewing a ruling on a motion for [a judgment as a matter of law], this Court uses the same standard the trial court used initially in granting or denying the [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must present substantial evidence to withstand a motion for [a judgment as a matter of law]. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for [a judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding *126 a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992)."
State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 302-03 (Ala.1999); Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 974-75 (Ala.1998).

B. The Law of Bad Faith

We begin by quoting extensively from State Farm Fire & Casualty Co. v. Slade, supra, in which this Court traced the development of the tort of bad faith in Alabama:
"In Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990), Justice Houston (with three Justices concurring and three concurring in the result) provided this Court with a road map to guide us through the vagaries of the tort of bad faith. First, Justice Houston noted that this Court had recognized the tort of bad-faith failure to pay a first-party claim in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981). Thomas, 566 So.2d at 740. In Chavers, this Court held:
"`[A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal."'
"405 So.2d at 7.
"Justice Houston then recognized that `[t]he Chavers test was refined and clarified in Gulf Atlantic Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981).' Thomas, 566 So.2d at 741. In Barnes, Justice Beatty, writing for the court, stated:
"`The first tier of the test promulgated by Mr. Justice Embry and adopted by this Court in Chavers establishes that the tort of bad faith refusal to honor a direct claim arises when there exists "no lawful basis for the refusal coupled with actual knowledge of that fact." "No lawful basis," as expressed in that opinion, means that the insurer lacks a legitimate or arguable reason for failing to pay the claim. That is, when the claim is not fairly debatable, refusal to pay will be bad faith and, under appropriate facts, give rise to an action for tortious refusal to honor the claim. When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. "Coupled with actual knowledge of that fact" implies conscious doing of wrong. Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.
"`The second tier of the test is an elaboration on the first. The trier of fact, by finding, on the part of the insurer, an "intentional failure to determine whether or not there was any lawful basis for refusal," may use that fact as an element of proof that no lawful basis for refusal ever existed. The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured. Of course, if a *127 lawful basis for denial actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith. Otherwise, the insurer's knowledge of the non-existence of any debatable reasons for refusal would be a question for the finder of fact, i.e., the jury.'
"405 So.2d at 924.
"Justice Houston also acknowledged that in National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179, this Court established the elements of a bad-faith claim. Thomas, supra, 566 So.2d at 742. In Bowen, this Court stated:
"`[T]he plaintiff in a "bad faith refusal" case has the burden of proving:
"`(a) an insurance contract between the parties and a breach thereof by the defendant;
"`(b) an intentional refusal to pay the insured's claim;
"`(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"`(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"`(e) if intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
"`In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.'
"417 So.2d at 183 (emphasis in original).
"Justice Houston then pointed out the following developments in the law of the tort of bad faith:
"`Following the decisions in Chavers, Barnes, and Bowen, this Court established what is now known as the "directed verdict on the contract claim standard" in bad faith cases. See Burkett v. Burkett, 542 So.2d 1215, 1218 (Ala.1989). Writing for the Court in National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala. 1982), Justice Shores stated:
"`"As noted by both sides in this case, the tort of bad faith refusal to pay a valid insurance claim is in the embryonic stage, and the Court has not had occasion to address every issue that might arise in these cases. In [National Security Fire & Cas. Co. v. Bowen], we set out the elements of the tort and attempted to show the plaintiff's burden in these cases. It is a heavy burden. In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."
"`The Dutton Court's characterization of a plaintiff's burden of proof as a "heavy" one was no doubt prompted by the Court's previous recognition in Chavers of the necessity for allowing insurers a broad range of freedom to *128 thoroughly evaluate claims and to decline payment in nonmeritorious cases. However, keenly aware of the fact that there were countervailing policy considerations that weighed in favor of an insured's right to have his claim properly evaluated and promptly paid by the insurer, the Dutton Court, in articulating the standard to be applied in "normal" or "ordinary" bad-faith cases, allowed for a different standard to be applied in certain unusual or extraordinary cases. Justice Jones, concurring specially in Dutton, elaborated on the majority's opinion:
"`"I concur completely with the opinion and write separately to elaborate on one point. The opinion correctly prefaces the `directed verdict on the contract claim' standard with the words `In the normal case'; and the phrase `if the evidence produced ... creates a fact issue ...' is preceded by the word `Ordinarily.' These are significant qualifications. Certainly, extreme cases will arise in which a fact issue will present a jury question on that claim. This is not the case before us; and, absent such circumstances, the `directed verdict on the contract claim' is the applicable standard for testing the tort of bad faith claim."
"`Later, Justice Jones, in his opinion concurring specially in Safeco Insurance Co. of America v. Sims, 435 So.2d 1219, 1224 (Ala.1983), wrote:
"`"This `directed verdict on the contract claim' test is not to be read as requiring, in every case and under all circumstances, that the tort claim be barred unless the trial court has literally granted plaintiff's motion for a directed verdict on the contract. Indeed, the words `entitled to a directed verdict' so indicate. Rather, this test is intended as an objective standard by which to measure plaintiff's compliance with his burden of proving that defendant's denial of payment was without any reasonable basis either in fact or law; i.e., that defendant's defense to the contract claim is devoid of any triable issue of fact or reasonably arguable question of law.
"`"Exceptions to the `directed verdict' rule will undoubtedly arise. Take the case where the insurer insists that its refusal of payment was grounded solely on a particular entry in a hospital record, and plaintiff denies the very existence of such an entry. Merely because the insurer may be able to withstand a directed verdict motionthe existence vel non of the record entry itself being an issue of factwould not, as a matter of law, bar the plaintiff's tort claim. This extreme example is to be distinguished from the more normal situation in which the factual dispute centers around the reasonable, but conflicting, inferences that may be drawn from a hospital record entry. If the entry in fact exists and one of the reasonable inferences of fact which may be drawn therefrom supports a legal basis for denial of the claim, Plaintiff would not be entitled to a directed verdict on the contract claim; thus, the claimant would be barred from proceeding with his tort of bad faith claim, even though the issue of fact may be resolved adversely to the insurer and the contract benefits awarded to the insured.
"`"Because of its potential relevance, one additional exception to the `directed verdict' test is suggested: Take the case of the insurer whose refusal of payment is based solely upon a legal position with respect to *129 the controlling principles of law and its application to the undisputed facts giving rise to the claim. While the insurer, under the guise of asserting a legitimate defense, could not be heard to take issue with clear, well settled, elementary principles of contract law, certainly the rule of reasonableness dictates a field of operation for a denial of benefits based upon arguable legal grounds which are fairly debatable, even though the trial judge may correctly reject such arguments and direct a verdict for the insured.
"`"Thus, as we have seen, Dutton's use of the terms `In the normal case,' and `Ordinarily' allows for exceptions to the `entitled to a directed verdict' test. In the first example, the insured may proceed with his bad faith claim even though he was not entitled to a directed verdict; and in the second example, the insurer would be entitled to a judgment on the tort claim even though the insured was entitled to a directed verdict on the contract claim. Certainly these rare exceptions will not be difficult to recognize, nor will the general rule, because of rare exceptions, be difficult to apply." (Emphasis in original).'
"Thomas, supra, 566 So.2d at 742-44.
"Later in the Thomas opinion, Justice Houston went on to cite examples of what the Court had, at that time, deemed `unusual or extraordinary cases.' These examples included cases in which the evidence showed that the insurer `intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review.' 566 So.2d at 744. See, e.g., Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987); Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala.1984). Other examples included cases in which the insurer `created' a factual issue that could have defeated the insured's tort claim under the `directed-verdict-on-the-contract-claim' standard. See, e.g., United American Ins. Co. v. Brumley, 542 So.2d 1231 (Ala.1989); Jones v. Alabama Farm Bureau Mut. Cas. Co., 507 So.2d 396 (Ala.1986).
"After Thomas, another `unusual or extraordinary' case arose. In Blackburn v. Fidelity & Deposit Co., 667 So.2d 661, 669 (Ala.1995), this Court recognized that the `directed-verdict-on-the-contract-claim' standard did not apply when an insurer, in an attempt to defeat the insured's preverdict motion for a [judgment as a matter of law], relied on its own `subjective belief that a portion of its insurance contract preclude[d] coverage.' The Court stated that the exception was necessary to prevent insurers from relying on ambiguous portions of a policy as an absolute defense to a claim of bad faith. Id.; see also Loyal Am. Life Ins. Co. v. Mattiace, 679 So.2d 229, 237-38 (Ala.1996), cert. denied, 519 U.S. 949, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996); Employees' Benefit Ass'n v. Grissett, 732 So.2d 968 (Ala.1998).
"The `unusual or extraordinary' case was then referred to as the `abnormal' bad-faith case and the `directed-verdict-on-the-contract-claim' case was called the `normal' bad-faith case. See Mattiace, supra, 679 So.2d at 241 (Maddox, J., dissenting); State Farm Fire & Cas. Co. v. Crumpton, 708 So.2d 136 (Ala.1997) (Houston, J., dissenting); Grissett, supra, 732 So.2d at 976. Thus, a plaintiff must establish that his or her claim is either the normal case or the abnormal case of bad faith. To this date, the abnormal cases have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer (1) intentionally or recklessly *130 failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim."
State Farm Fire & Cas. Co. v. Slade, 747 So.2d at 303-07 (some citations omitted).
Further, in Aetna Life Insurance Co. v. Lavoie, 505 So.2d 1050, 1052-53 (Ala.1987), we recognized that it was an insurer's responsibility to marshal all of the pertinent facts with regard to its insured's claim before it refused to pay. In that case, we stated:
"`[T]he decision of the insurance company to deny a claim under an insurance policy must be judged by what was before it at the time the decision was made.' Considering the fact that the decision to deny [the claim in this case] was made without the benefit of `critical' sections of the medical file, the jury could find that the claim was not `properly investigated,' and that there was a `reckless indifference to facts or to proof.' ...
". . . .
"The question of whether the bad faith is to be tested at the time of the first denial, or at the time of subsequent denials, is of no consequence in this case, because the deficiency in the [claims file] continued through the first three successive denials. Once the bad faith has occurred, once the duty to use good faith in considering insurance claims has been breached, the insurance company cannot later seek to justify its denial by gathering information which it should have had in the first place.... Thus, the jury could have found that Aetna exhibited reckless indifference to the facts or to the proof submitted by the Lavoies on their claim, thereby satisfying the `actual knowledge' element of the testand it is evident, from their verdict, that they did. Facts certainly exist which support the jury's conclusion."
505 So.2d at 1053 (citations omitted). See also Blackburn v. Fidelity & Deposit Co., 667 So.2d 661, 672 (Ala.1995) (recognizing that actions occurring after an insurer has denied coverage does not insulate the insurer from bad-faith liability and does not determine whether the insurer is liable for bad faith).

C. Were the Bad-Faith Claims Properly Submitted to the Jury?

We begin our analysis of whether the bad-faith claims were properly submitted to the jury by noting that this case involves allegations against National of both normal and abnormal bad faith; we conclude that the jury could have properly found National liable under either type or both types of bad faith. Consequently, we conclude that Sockwell's claims of bad faith were properly presented to the jury.
We now address National's argument that the trial court improperly submitted the bad-faith claims to the jury because, it argues, Sockwell failed to establish the prima facie elements of her bad-faith claims. National contends that, because Sockwell's claim for UIM benefits had not ripened at the time National denied her claim, she cannot establish that she was entitled to benefits; thus, it argues, there can be no bad faith resulting from that denial. We reject this argument for two reasons.
First, National did not deny Sockwell's claim because her claim for UIM benefits had not yet ripened. National never even inquired as to whether Sockwell had settled her claims with the other *131 insurance carriers involved. We note that it is the insurer's duty to marshal all of the facts pertinent to its denialbefore denying the claimif the insurer wishes to rely upon those facts as a defense to a claim of bad faith. See Aetna Life Ins. Co. v. Lavoie, 505 So.2d at 1053 ("Once the bad faith has occurred, once the duty to use good faith in considering insurance claims has been breached, the insurance company cannot later seek to justify its denial by gathering information which it should have had in the first place."); see also Blackburn v. Fidelity & Deposit Co., 667 So.2d at 672.
More significantly, National does not and cannot allege on appeal that a proper investigation and evaluation of Sockwell's claim would have revealed that coverage was not due under the policy; in fact, the record reveals just the opposite National, through Kathy West, admitted at trial that the medical records and other documentation submitted to its claims adjuster, before the September 1998 denial, established that Sockwell's claim was due to be paid. Additionally, West admitted that, after this lawsuit was filed, National paid Sockwell the UIM limits available under her insurance policies. Thus, we conclude that, under the facts of this case, the breach-of-contract element required for a bad-faith claim was satisfied.
We also note that the case was submitted to the jury only on the bad-faith claims; the jury did not hear Sockwell's breach-of-contract claim. In the case of State Farm Fire & Casualty Co. v. Slade, supra, this was a point of some distinction:
"Therefore, we reject the Slades' argument that in the abnormal bad-faith case in which the insurer fails to properly investigate the insured's claim contractual liability is not a prerequisite to bad-faith liability, and the Slades' argument that the tort of bad faith provides a cause of action that is separate and independent of an insurance contract. In so doing, we make it clear that in order to recover under a theory of an abnormal bad-faith failure to investigate an insurance claim, the insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim.
"This is nothing new. Under the elements established in Bowen, supra, the plaintiff has always had to prove that the insurer breached the insurance contract. Practically, the effect is that in order to prove a bad-faith-failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured's loss was covered under the terms of the contract. This result preserves the link between contractual liability and bad-faith liability required by Chavers, supra, and Dutton, supra."
Slade, 747 So.2d at 318 (footnote omitted). However, in a footnote to the above-quoted language, the Slade Court noted:
"We note that this holding has no effect on those cases in which an insured sues the insurer for bad-faith denial of an insurance claim but does not sue for breach of contract and the case proceeds to the jury on a claim of bad faith alone. See Livingston v. Auto Owners Ins. Co., 582 So.2d 1038 (Ala.1991); Jones v. Alabama Farm Bureau Mut. Cas. Co., 507 So.2d 396 (Ala.1986); Aetna Life Ins. Co. v. Lavoie, [505 So.2d 1050 (Ala. 1987)], supra."
747 So.2d at 318 n. 7. Thus, even if we accepted National's argument, which we do not, we would still conclude that Sockwell's *132 abnormal bad-faith claim was properly presented to the jury. Accordingly, we reject National's claim that Sockwell's bad-faith claims must fail because she had yet to exhaust the other coverages available to her at the time National improperly denied her claim for UIM benefits.
We also reject National's argument that it was entitled to a postverdict judgment as a matter of law because, it argues, Sockwell failed to establish that National acted with bad-faith intent. We conclude that the jury heard ample evidence upon which it could have found that National acted in bad faith. First, we note that the record contains conflicting evidence regarding the date National decided to deny Sockwell's claim. Although the denial letter made the basis of this action was not formally issued until September 1998, Sockwell presented evidence indicating that the decision to deny the claim was made as early as May 18, 1998, while National was purportedly still investigating Sockwell's claim. The jury could have inferred National's intentional bad faith from this evidence.
Additionally, it is undisputed that, even though National knew the UIM provision and the workers' compensation limit-of-liability provision were void under Alabama law, it took no action to delete those provisions from its standard policy and still had not done so at the time Sockwell's claim went to trial. The jury could have construed National's failure to update its policy as further evidence of bad faith.
Second, even if the workers' compensation limit-of-liability provision contained in the National policy had not been void under Alabama law and the adjuster had been able to properly apply that provision to Sockwell's claim, the adjuster never even attempted to apply the provision as written. As Kathy West admitted at trial, before the issuance of the September 1998 denial letter, National's claims file contained documentation establishing that Sockwell had suffered all of the elements of loss sustainable in an automobile accident. However, National's adjuster never even attempted to discern which of those elements of loss were not covered under Alabama workers' compensation law and, thus, which of those elements would be compensable under the National policy. The jury could have construed this as evidence indicating that the adjuster either intentionally or recklessly disregarded the facts and proof submitted by Sockwell in support of her claim. Whether to accept National's self-serving statement that its adjusterone with 24 years of experience in adjusting workers' compensation and automobile claimssimply made a "mistake" in failing to pay Sockwell's claim and in failing to properly evaluate Sockwell's claim presented a question of fact for the jury. See Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 977 (Ala.1998). Based upon this evidence, we conclude that the trial court properly presented the bad-faith claims to the jury.
For these reasons, we reject National's argument that Sockwell failed to establish the prima facie elements of her bad-faith claims. The trial court properly denied National's preverdict and postverdict motions for a judgment as a matter of law.

II. Was the Compensatory-Damages Award Excessive?

National contends that the $201,000 compensatory-damages award, an award it claims represents damages solely for mental anguish, is excessive because, it says, Sockwell failed to give sufficient testimony regarding her alleged mental anguish to justify that award. Regarding our review of a jury's award of damages based on a claim of excessiveness, this Court has recognized:

*133 "The authority to disturb a jury verdict on the ground of excessiveness of damages is one which should be exercised with great caution....
". . . .
"We begin by recognizing that the right to a trial by jury is a fundamental, constitutionally guaranteed right, Art. I, § 11, Const. of 1901, and, therefore, that a jury verdict may not be set aside unless the verdict is flawed, thereby losing its constitutional protection. It is only in those cases that a trial court, pursuant to [Ala]. R. Civ. P. 59(f), and this Court, pursuant to Code 1975, § 12-22-71, may interfere with a jury verdict. Insofar as damages are concerned, a jury verdict may be flawed in two ways. First, it may include or exclude a sum which is clearly recoverable or not as a matter of law, or which is totally unsupported by the evidence, where there is an exact standard or rule of law that makes the damages legally and mathematically ascertainable at a precise figure. In these situations, a trial court may, and should, reduce or increase the amount of the verdict to reflect the amount to which the parties are entitled as a matter of law. Second, a jury verdict may be flawed because it results, not from the evidence and applicable law, but from bias, passion, prejudice, corruption, or other improper motive. It is this category of cases that most troubles both trial and appellate courts.
"The cases have consistently held that in deciding whether a jury verdict is excessive because it is the result of passion, bias, corruption, or other improper motive, a trial judge may not substitute his judgment for that of the jury. We have also recognized that the trial judge is better positioned to decide whether the verdict is so flawed. He has the advantage of observing all of the parties to the trialplaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review trial court action in this sensitive area, although increasingly they are required to do so. Therefore, it is not only appropriate, but indeed our duty, to require the trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages."
Hammond v. City of Gadsden, 493 So.2d 1374, 1378-79 (Ala.1986) (citations omitted); see also Norfolk Southern Ry. v. Bradley, 772 So.2d 1147, 1154-55 (Ala. 2000).
Since the issuance of our opinion in Hammond v. City of Gadsden, supra, we have addressed the issue of mental-anguish damages more directly, recognizing an additional basis upon which a jury's verdict awarding damages for mental anguish or emotional distress may be flawed. In Kmart Corp. v. Kyles, 723 So.2d 572, 578 (Ala.1998), we held that an award of mental-anguish damages was subject to a strict-scrutiny analysis if the plaintiff suffered no physical injury and offered little or no direct evidence concerning the mental suffering sustained as a result of the defendant's wrongdoing. Id. Our holding in Kyles did not alter the law as previously established in Alabama, that the presence of a physical injury or physical symptoms is not a prerequisite for a claim of damages for mental anguish, and that once the plaintiff has presented some evidence of mental anguish, "the question of damages for mental anguish is for the jury." Alabama Power Co. v. Harmon, 483 So.2d 386, 389 (Ala.1986). Our holding in Kyles simply addressed the strength of the presumption *134 of correctness to be placed on the jury's award in cases where the plaintiff has suffered no physical injury or physical suffering and offers little or no evidence concerning the nature of his or her alleged mental anguish. See Kyles, 723 So.2d at 578.
However, the strict-scrutiny rule established in Kyles is inapplicable in a case where the plaintiff suffers physical injury or pain in conjunction with emotional distress. Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1044 (Ala. 1999) ("That principle established in [Kyles] does not apply in this case, because the Danielses each suffered physical injuries and experienced varying degrees of pain and suffering."). In Daniels, we also stated that "[j]ury verdicts are presumed correct, `especially where damages awarded are for pain and suffering.'" Daniels, 740 So.2d at 1045, quoting Coca-Cola Bottling Co. v. Parker, 451 So.2d 786, 788 (Ala.1984).
The record in this case reveals that Sockwell presented evidence to the jury establishing that she suffered both physical pain and mental anguish as a result of National's wrongdoing. Sockwell testified as follows:
"A: First, it confused me because I couldn't understand why a company that I had put my faith and trust in, you know, to be there for me when I need them. And, you know, to turn me down a second time, hurt. It really hurt, and then I became angry. And that posed another stressful situation.
"Q: Did it make you mad?
"A: Yes.
"Q: Betty, the feelings that you had about this, the emotions that you experienced, how did they affect you physically, if at all?
"A: I couldn't sleep. I would get tired, and this would cause my problems to get worse. The pain would get worse. ThatAnd that would mean having to take extra medication to try and keep the pain in control. That would make me tired and sleepy. And I didn't feel like doing anything. So I just, basically, just, kind of, had to lay around and take medication to try and keep things under control."
We acknowledge that Sockwell's physical injuries did not originally arise from tortious conduct on the part of National. However, Sockwell testified that her physical condition worsened as a result of National's wrongdoing. Under basic tort principles, National must take Sockwell in whatever condition it finds her. The simple fact that, at the time National acted wrongfully, Sockwell was already suffering from some degree of physical pain does not insulate National from liability for its wrongful actions that directly worsened her pain.
Because Sockwell testified that she suffered both emotionally and physically as a result of National's misconduct, the strict-scrutiny standard of Kyles does not apply in this case. See Daniels, supra. Thus, our review of the compensatory-damages award is limited to the question whether the amount of damages awarded was the result of passion, bias, corruption, or other improper motive.
In his posttrial order, the trial judge noted no such improper action by the jury, and he refused to remit the compensatory-damages award. We likewise find nothing in the record to indicate that the jury's award was the result of passion, bias, corruption, or other improper motive. We agree with the trial judge's assessment as to this issue.
*135 Because the record contains evidence in support of the jury's verdict, we decline to interfere with the award of $201,000 in compensatory damages to Sockwell. Simply because the amount awarded Sockwell for her pain and suffering was significant does not justify interfering with an otherwise proper jury verdict.
"This Court has long held that `[t]here is no fixed standard for ascertainment of compensatory damages recoverable ... for physical pain and mental suffering' and that `the amount of such [an] award is left to the sound discretion of the jury, subject only to correction by the court for clear abuse and passionate exercise of that discretion.' This Court has consistently held that a trial court cannot interfere with a jury verdict merely because it believes the jury gave too little or too much."
Daniels, supra, 740 So.2d at 1044 (citations omitted). We affirm the award of $201,000 in compensatory damages.

III. Was the Punitive-Damages Award Excessive?

National contends that the award of $600,000 to Sockwell as punitive damages is grossly excessive and contrary to the law governing such awards.[12] We recently announced that in Alabama punitive-damages awards are subject to a de novo standard of review, in accordance with the recent holding of the United States Supreme Court. See Acceptance Ins. Co. v. Brown, 832 So.2d 1 (Ala.2001), citing Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). Accordingly, in reviewing a punitive-damages award, this Court applies its own rationale when considering the "guideposts" established in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the factors recognized by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).

A. The BMW Guideposts

We first analyze the three guideposts established by the United States Supreme Court in BMW.

1. The reprehensibility of the defendant's conduct.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW, 517 U.S. at 575, 116 S.Ct. 1589. Although there is no definitive yardstick by which to measure a defendant's reprehensibility, the United States Supreme Court in BMW acknowledged that trickery and deceit are more reprehensible than negligence, and that acts of affirmative misconduct or deliberate false statements are more reprehensible than innocent misrepresentations. Id. at 579-80, 116 S.Ct. 1589. The Supreme Court also recognized that economic damage inflicted upon a financially vulnerable plaintiff might support a larger punitive-damages award. Id. at 576, 116 S.Ct. 1589.
In reviewing this guidepost and the evidence applicable thereto, we quote extensively from the trial court's posttrial order:

*136 "An important aspect of the plaintiff's case was the denial of her claim by the defendant's adjuster, Patrice Hawthorne, under circumstances indicating that Hawthorne intentionally or recklessly denied the claim when she knew it was due to be paid. The evidence indicated that Hawthorne ostensibly relied upon a `limitation of liability' provision in the policy to deny Sockwell's claim because she had also pursued a claim for workers' compensation benefits arising from the subject automobile accident. The policy provision provided that the defendant was not obligated to pay any elements of loss for which the claimant (Sockwell) could also recover under workman's compensation laws.
"However, Hawthorne admitted at trial that based upon her training and experience, she knew workers' compensation claims generally involved only two elements of recovery: medical benefits and lost wages. She further admitted that tort claims arising from automobile accidents, such as Sockwell's, generally involved many other elements of loss such as mental anguish, pain and suffering, scarring and disfigurement, disability, loss of enjoyment of life, etc. Hawthorne had medical records in the claims file showing that Sockwell suffered injury compensable under these other elements of loss. Even though she knew the policy provision would not preclude payment for these other elements of loss suffered by Sockwell in the automobile accident, Hawthorne refused to continue her investigation of Sockwell's claim, and instead intentionally denied it. Contrary to the defendant's assertion, Hawthorne was not laboring under a mistake of law; instead, she intentionally misapplied policy language to deny a claim that she knew was compensable. The Court finds such conduct reprehensible.
"In an effort to conceal her bad faith denial of Sockwell's claim, Hawthorne submitted false testimony in an affidavit prepared during discovery in this case, and submitted in connection with the defendant's motion for summary judgment. Hawthorne's affidavit was submitted by defense counsel in an effort to explain or justify her denial of the claim. However, Hawthorne admitted at trial that she knew certain portions of the affidavit were false, but she nevertheless allowed the affidavit to be submitted and used in connection with this case. Efforts to conceal wrongful conduct, such as submitting false affidavit testimony, are matters to be considered when assessing the reprehensibility of the defendant's conduct. Green Oil, 539 So.2d at 223.
"The defendant's misconduct did not stop with the intentional misapplication of the policy provision by Patrice Hawthorne. Evidence was introduced at trial indicating that the litigation department at National Insurance Association knew many years ago that the provision upon which Hawthorne relied in denying Sockwell's claim was illegal and void as against public policy, although company officials failed to communicate such information to adjusters such as Hawthorne handling Alabama claims. Thus, even though Hawthorne knew Sockwell's claim was not limited or excluded by the policy language at issue, the provision was nevertheless totally and completely illegal, and the defendant did nothing to remove the illegal language from its policy. In fact, the evidence indicates that even though this case had been pending for almost two years at the time of trial, the defendant had still done nothing to remove the illegal provision from its policy. Like concealment of the misconduct, the length and duration of the *137 conduct should also be considered in determining the reprehensibility of a party's conduct. Green Oil, 539 So.2d at 223.
"Perhaps the most reprehensible conduct was committed by the defendant's claims supervisor, Kathy West, who [was the defendant's representative] at trial. West testified that upon receipt of this lawsuit in March 1999, she reviewed the claim filed prepared by Patrice Hawthorne and immediately concluded that the claim had been improperly denied, and should have been paid. Nevertheless, testimony from the attorneys who were handling Sockwell's claim at that time indicated West made an offer of $41,000, and expressly conditioned payment of Sockwell's underinsured motorist claim upon her release and dismissal of the bad faith claim. Such a conditioned offer, when West knew the claim was due to be paid, is evidence of another, separate act of bad faith.
"Moreover, testimony from Sockwell's former attorneys indicated that West threatened to abuse the legal system if Sockwell did not accept her offer by playing hardball and by dragging out discovery as long as possible so that Sockwell would not see the policy proceeds for many, many years. West told Sockwell's former attorneys that Sockwell needed the money, and that they should tell her to take it or face the consequences of a protracted and expensive litigation battle. The Court finds this conduct to be shocking and supportive of the punitive damages award in this case.
"Finally, the Court notes that even though West testified she knew Sockwell's claim should have been paid, the defendant filed an answer to the plaintiff's complaint denying any obligations to pay Sockwell underinsured motorist benefits. This fact was introduced at trial, and evidences a pattern of continued acts of bad faith through the litigation process. `Factors such as the duration of the conduct, the defendant's awareness of the hazards created or likely to be created by his conduct, any deliberate concealment of those hazards, and the frequency of the kind of conduct complained of, can be considered in determining the reprehensibility of a party's conduct.' Tyson Foods, Inc. [v. Stevens, 783 So.2d 804, 810 (Ala.2000) ]. Substantially all of these factors are present in the defendant's conduct here, which the Court determines to be extremely reprehensible, if not outright egregious."
(Emphasis in original.)
We find the trial court's analysis of the evidence pertinent to this guidepost to be thorough and accurate, and we adopt that analysis as our own. The evidence summarized in the trial court's order establishes a substantial degree of reprehensibility on the part of National. Our analysis of this BMW "guidepost" as it relates to this case supports a substantial award of punitive damages.

2. Ratio of punitive damages to compensatory damages.

The second indicium of the reasonableness or the excessiveness of punitive damages the Supreme Court recognized in BMW is the ratio of the punitive-damages award to the actual harm inflicted upon the plaintiff. BMW, 517 U.S. at 580, 116 S.Ct. 1589. In this case, the ratio of punitive damages to compensatory damages is 3:1, a ratio for which substantial support can be found under Alabama law. See Prudential Ballard Realty Co. v. Weatherly, 792 So.2d 1045 (Ala.2000) and the cases cited therein; see also § 6-11-21(a), Ala. Code 1975. Accordingly, the ratio of punitive *138 damages to compensatory damages in this case indicates that the punitive-damages award is reasonable.

3. Sanctions or penalties that could be imposed for National's wrongful conduct.

This Court is not aware of any criminal or other civil sanctions that could be imposed against National for its wrongful conduct in this case. Thus, no other methods of punishment and deterrence are available, and this factor does not support a finding that the punitive damages awarded in this case are excessive.

4. Summary of the BMW guideposts.

The reprehensibility of National's actions favor a significant punitive-damages award; the ratio of the punitive-damages award to the compensatory-damages award in this case is 3:1, a ratio that has garnered substantial support by this Court; and no criminal or comparable civil sanctions are available to punish National for its misconduct. Our analysis of the BMW guideposts indicates that the $600,000 punitive-damages award is reasonable. However, we must also consider the factors established by this Court in Hammond and Green Oil.
B. The Hammond/Green Oil Factors.

1. The punitive-damages award and the actual or likely harm caused.

"`Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.'"
Green Oil, 539 So.2d at 223, quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially).
Is the harm caused by National's misconduct, considering the actual harm as well as the harm likely to result from that misconduct, slight or grievous? We find it to be grievous.
We recognize that the amount of the insurance benefits in dispute was $40,000neither the largest nor the smallest amount this Court has addressed in a Hammond/Green Oil analysis. However, the actual harm caused by National's wrongful evaluation and its denial of Sockwell's claim was twofold. First, Sockwell was prevented for some 17 months from obtaining the $40,000 insurance benefits to which she was entitled and which National knew she was entitled to and needed. Second, Sockwell suffered physically and emotionally as a result of the wrongful evaluation and denial of her claim. Thus, the actual harm caused by National's misconduct was significant.
However, another harm of an entirely different nature is also likely to result from National's misconduct, if that conduct is not deterred in the future. How many other National insureds with valid claims for insurance benefits will be denied the right to those benefits if National continues to retain invalid provisions in its insurance policies? How many insureds will fail to pursue their claims, believing that National has validly denied those claims? How many other insureds will lose the benefit of their insurance contracts if National's claims representatives continue to act with such intentional or reckless disregard for an insured's right to a proper evaluation of his or her claim?
Pursuing a bad-faith claim is a risky and expensive venture. It is possible that some of even the more determined plaintiffs may not be able to retain legal counsel because of the degree of risk involved. Considering the actual harm as well as the *139 harm likely to result from National's misconduct, we find such misconduct to justify a significant punitive-damages award.

2. The reprehensibility of National's conduct.

Under a Hammond/Green Oil review, we assess the reprehensibility of a defendant's conduct by considering "`[t]he duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct.'" Green Oil, 539 So.2d at 223, quoting Lavoie, 505 So.2d at 1062. We note that we thoroughly addressed these considerations under the BMW guidepost of reprehensibility; we concluded that National's conduct was reprehensible in numerous ways relevant to this first Hammond/Green Oil factor: the misconduct consisted not of a single incident but of several incidents over a lengthy period; National was aware that its conduct was likely to harm Sockwell; National attempted to coerce Sockwell into dismissing her bad-faith claims by offering her the policy benefits to which she was already entitled; and National submitted a false affidavit to the trial court regarding its evaluation of Sockwell's claim in an apparent attempt to conceal its misconduct. We find National's actions in this case, as a whole, to be particularly reprehensible and to support a significant award of punitive damages.

3. National's profit from its misconduct.

National contends that it has not profited from its misconduct because, it argues, it ultimately paid Sockwell the $40,000 UIM benefits that prompted this action. However, as the trial court noted in its posttrial order, National had use of the policy proceeds from September 1998 until April 2000, when Sockwell's claim was eventually paid. During that approximately 17 month period, National benefitted financially from having possession of the policy proceeds through earnings, interest, or through some other form of financial benefit. The exact amount of this profit or gain is unknown.
Additionally, evidence was introduced during the trial indicating that, although National knew, even before it denied Sockwell's claim, that certain of the insurance provisions contained in its policy were void under Alabama law, Nationalat least at the time Sockwell's case went to trial continued to retain those provisions in its policy. National stands to profit by leaving such provisions in the insurance policies it issues in this state by repeating the same misconduct that occurred here, with the hope that its misconduct might go unchallenged. Whether National has profited from such conduct is unknown.

4. National's financial position.

According to the trial court's posttrial order, National indicated that "its financial position is sufficiently strong and adequate such that this factor does not provide a basis for remitting the punitive damage award." We find no other references in the record to the impact of the punitive-damages award upon National's financial position. Accordingly, this factor does not support a remittitur of the punitive-damages award.

5. Costs of litigation.

In analyzing this factor, the Court is required to consider whether the punitive-damages award is sufficient to reward the plaintiff's counsel for assuming the risk of bringing the lawsuit and to encourage other victims of wrongdoing to come forward. Green Oil, 539 So.2d at 223; see also Life Ins. Co. of Georgia v. Parker, 726 So.2d *140 619, 624 (Ala.1998). Parker required the parties to travel to Indiana for depositions and to review a large number of records. The trial of this action lasted four days. The costs that Sockwell and her attorneys incurred in bringing this case to trial and the need to encourage others in similar situations to bring wrongdoers to trial justify a significant punitive-damages award.

6. Criminal sanctions.

We are unaware of any applicable criminal sanctions for National's wrongdoing. Accordingly, this factor is inapplicable to our analysis of the Hammond/Green Oil factors.

7. Other civil actions.

We are unaware of any other civil actions that have been filed against National as a result of the wrongful conduct at issue in this case. This factor is therefore inapplicable to our analysis of the Hammond/Green Oil factors.

8. Summary of the Hammond/Green Oil analysis.

Two of the seven Hammond/Green Oil factors are inapplicable to this case: criminal sanctions and other civil actions. However, the other Hammond/Green Oil factors counsel in favor of a significant punitive-damages award: the relationship of the punitive-damages award to the actual and likely harm; the reprehensibility of National's conduct; National's profit from its misconduct; National's financial position; and the costs of litigation.

C. Final Analysis of the Punitive-Damages Award.

Application of the three BMW guideposts supports a significant punitive-damages award. Our analysis of the Hammond/Green Oil factors also supports a significant punitive-damages award. For these reasons, we find the $600,000 punitive-damages award reasonable and of a sufficient amount to punish National, without compromising its due-process rights.

IV. Is Bad Faith in the UIM Context Ill Conceived, and, as Applicable Only to the Insurance Contract Context, Unconstitutional?

National contends, in a conclusory fashion, that the tort of bad-faith failure to pay a claim, because it is applicable only to insurance contracts, is unconstitutional. This Court previously has addressed the constitutionality of this tort; we see no need to revisit that analysis here. See, e.g., United American Ins. Co. v. Brumley, 542 So.2d 1231 (Ala.1989).
However, we feel compelled to respond to National's contention, made in reliance upon Quick v. State Farm Mutual Automobile Insurance Co., 429 So.2d 1033 (Ala. 1983), that an insurer and its insured, in the context of a UIM-benefits claim, are in adversarial roles and that, therefore, the insurer cannot be subject to a claim of bad-faith failure to pay, bad-faith failure to properly investigate a claim, or bad-faith failure to submit its insured's UIM claim to a cognitive review. We do not read our holding in Quick v. State Farm Mutual Automobile Insurance Co., supra, to compel such a conclusion, nor do we find any justifiable reason to place an insurer, which normally serves its insured in a fiduciary capacity, into an adversarial role with its insured simply because the insured seeks a particular type of benefit under the policy.
In Quick, this Court recognized that "until the liability of the uninsured motorist has been determined, the insurer and insured occupy an adversary position toward each other." Quick, 429 So.2d at 1035. Thus, it was because the liability of the uninsured motorist in Quick had not yet been determined that the Quick Court viewed the insurer and the insured as adversaries, not because of the type of benefits being sought.
*141 In this case, the liability of the uninsured motorist had been determined before National's September 1998 denial, and National did not dispute that Sockwell's damages exceeded the other insurance coverage available to her. National, at trial, did not dispute that Sockwell was entitled to benefits at the time she was denied benefits in September 1998. Clearly, no adversarial relationship existed between National and Sockwell at the time of the September 1998 denial.
Moreover, the duty of good faith arises, not out of the fiduciary relationship existing between an insurer and its insured, but out of the special contractual relationship that exists between those two parties. See Quick, 429 So.2d at 1035 (Torbert, C.J., concurring specially); The Standard Plan, Inc. v. Tucker, 582 So.2d 1024, 1027 (Ala.1991) (discussing Chavers v. National Sec. Fire & Cas. Co., 405 So.2d 1 (Ala.1981)). An insured purchases certain insurance coverage hoping to protect himself or herself against specified losses; the insurer agrees to provide that coverage under certain terms and for a specified premium. We do not view such a relationship as adversarial simply because the insured seeks the benefit of his or her bargain under UIM coverage, as opposed to some other coverage for which the insured has contracted.

Conclusion
We affirm the trial court's denial of National's motions for a judgment as a matter of law. We affirm the $201,000 compensatory-damages award. After conducting a de novo review pursuant to BMW and Hammond/Green Oil, we conclude that $600,000 punitive-damages award is a reasonable amount to punish National for its misconduct and to deter it from engaging in similar conduct in the future.
AFFIRMED.
MOORE, C.J., and HOUSTON, SEE, BROWN, JOHNSTONE, and HARWOOD, JJ., concur.
LYONS and WOODALL, JJ., concur in part and dissent in part as to the rationale and concur in the judgment.
LYONS, Justice (concurring in part and dissenting in part as to the rationale and concurring in the judgment).
With two exceptions I concur in all aspects of the meticulous analysis in the main opinion and, as to those two exceptions, I respectfully must dissent.
I dissent as to that portion of the main opinion that holds that this proceeding involves allegations of both "normal" and "abnormal" bad faith. Because, by its admission of liability, National Insurance Association mooted the requirement of a directed verdict in Sockwell's favor on the breach-of-contract claim, this case involves only normal bad faith.
I also dissent from a portion of the main opinion's rationale in its treatment of the compensatory-damages award. I do not consider the exception to Kmart Corp. v. Kyles, 723 So.2d 572, 578 (Ala.1998), recognized in Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1044 (Ala.1999), to be germane in this case, where National was not the tortfeasor and did not cause the physical injury. However, I agree with the main opinion's statement that National must take Betty Sockwell as it finds her. See Cooper v. Magic City Trucking Serv., Inc., 288 Ala. 585, 264 So.2d 146 (1972) (when one injures another, so as to aggravate preexistent conditions, the actor is liable for all injuries proximately resulting therefrom, although a normal person's injuries would have been much less severe). When National denied coverage to Sockwell, she was already suffering physical *142 pain. She testified as to the extent of her mental anguish over a period of approximately one year in the context of her preexisting condition and thus subjected her claims of mental anguish to the opportunity for a thorough cross-examination. This Court must reach the same conclusion in this case as it reached in Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166 (Ala.2000). In that case, this Court observed:
"This is not a case where the plaintiff presented only a minimum of evidence regarding mental anguish, so as possibly to avoid being cross-examined by questions calling for information about the plaintiff's prior experiences. Compare [Delchamps, Inc. v.] Bryant, 738 So.2d [824,] 835 [ (Ala.1999)] (testimony from the plaintiff could have led to cross-examination about previous felony convictions); Kyles, 723 So.2d at 579 (testimony from the plaintiff concerning mental anguish could have led to cross-examination about previous arrests)."
789 So.2d at 179 n. 8. The jury's award of compensatory damages, although higher than I might have awarded, withstands the scrutiny of Kyles.
WOODALL, J., concurs.
NOTES
[1] In her complaint, Sockwell alleged that National had breached the contract of insurance by failing to pay her the insurance proceeds to which she was entitled. In its answer to the complaint, National denied that it had breached the contract of insurance. However, before the case was submitted to the jury, National paid Sockwell the policy limits of the insurance contract. Accordingly, the parties settled the breach-of-contract claim, and this claim was not submitted to the jury.
[2] We have reproduced the computer-notepad entries exactly as they were entered, leaving abbreviations and omitting capitalization and without attempting to correct punctuation.
[3] As noted earlier, before this case was submitted to the jury, National paid Sockwell the policy limits available under her insurance contracts. That claim was not submitted to the jury.
[4] West testified that "GRE stands for Guardian Royal Exchange," and that "GRE ... owned National Insurance Associates back in 1998." By the time this matter went to trial, GRE was known by the name "Go America."
[5] Counsel for both parties agreed that evidence of settlement discussions and attempts would be admissible at trial.
[6] Grant Wright and Mike Tanner, initially Sockwell's attorneys during settlement negotiations, were called as fact witnesses at the trial. Wright refused to agree that National's UIM coverage was merely secondary and did not ripen until all other available coverage had been exhausted. Wright testified that "I understood the law at that time, ... [was] that if the insurance contract, Ms. Sockwell's insurance contract, said they were secondary to any other UIM coverage which she was a passenger, then that would be the case. If that's what the contract said. I never studied the contract in detail because I never had any doubt that everybody ought to pay. Her injuries were so severe, it was a no-brainer to me. I thought everybody would just fall in line and pay their money." Wright did agree that once Sockwell had exhausted the policy limits available to the party responsible for the accident, he would then look to any available UIM coverage. However, Wright refused to agree that the obligations of the various insurers to pay UIM benefits would arise in any particular order.
[7] Sockwell's attorneys moved to strike the affidavit from the record. This motion was apparently granted.
[8] The terms "worried," "feared," and "afraid" were used at trial and referred to Ms. Hawthorne's affidavit, which read, in pertinent part: "I feared that Mrs. Sockwell's coverage would not allow her to be paid twice for [the] same injuries. And so I once again reviewed her policy."
[9] Hawthorne identified this "free-form letter" as the September 18, 1998, denial letter sent to Sockwell and her attorney.
[10] National's computer records reflect an "ENT-05181998-Free Form Letter." According to Kathy West, "ENT" stands for the entry date or the beginning date of the indicated action.
[11] National's computer records reflect "CMPTD-09181998," which, according to Hawthorne, means the denial letter was completed on September 18, 1998.
[12] National also contends that the award of punitive damages is contrary to the evidence presented in this case and that that part of the judgment awarding the punitive damages should be reversed. However, we have already concluded that the evidence supports the jury's verdict that National acted in bad faith. Therefore, we need not address this contention.